UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CYNTHIA HERRICK, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SHUTTERSTOCK, INC.,<br><br>*Defendant.* | Case No. 1:23-cv-03191-JPC-SLC<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL** |

**CERA LLP**
Solomon B. Cera (admitted *pro hac vice*)
Thomas C Bright (admitted *pro hac vice*)
50 California Street, Suite 1500
San Francisco, California 94111
Telephone: 415-777-2230
scera@cerallp.com
tbright@cerallp.com

**DUNCAN FIRM, P.A.**
James H. Bartolomei, III
Of Counsel at Duncan Firm, P.A.
809 W. 3rd Street
Little Rock, Arkansas 72201
Telephone: 501-228-7600
james@duncanfirm.com

**HOBEN LAW**
Bryan D. Hoben, Esq.
1112 Main Street
Peekskill, New York 10566
Telephone: 347-855-4008
bryan@hobenlaw.com

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................................................ ii–iii

**I.  INTRODUCTION** ............................................................................................................................ 1

**II.  FACTUAL BACKGROUND** ........................................................................................................ 4

    **A.  Plaintiff Cynthia Herrick** ................................................................................................. 4

    **B.  Defendant Shutterstock, Inc.** .......................................................................................... 6

    **C.  Shutterstock Controls the Entire Licensing & Kill Notice Process** ......................... 6

    **D.  Shutterstock's Uniform Conduct After Receiving Notice of Infringement** ........... 8

**III.  ARGUMENT** ................................................................................................................................ 11

    **A.  The Prerequisites for Class Certification are Satisfied** .......................................... 11

        **1.  Plaintiff Has Article III and Class Standing** ...................................................... 11

        **2.  The Class is Ascertainable** .................................................................................... 13

    **B.  The Class Certification Standards Are Met Here** ................................................... 15

        **1.  Plaintiff Satisfies the Requirements of Rule 23(a)** ........................................... 16

            **a.  The Class is Sufficiently Numerous** ............................................................. 16

            **b.  Common Questions of Law and Fact** ........................................................... 17

            **c.  Plaintiff's Claims Are Typical** ..................................................................... 18

            **d.  Plaintiff Will Adequately Represent the Class** .......................................... 19

        **2.  Plaintiff Satisfies Predominance Under Rule 23(b)(3)** ..................................... 20

            **a.  Questions of Law and Fact Predominate** .................................................... 21

            **b.  A Class Action is the Superior Method** ....................................................... 26

        **3.  The Proposed Class Satisfies Rule 23(b)(2)** ....................................................... 28

    **D.  Appointment of Class Counsel** ...................................................................................... 29

**IV.  CONCLUSION** ............................................................................................................................. 30

i

## TABLE OF AUTHORITIES

### Cases

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ............................................................15, 21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455 (2013)........................................15, 16

*Arista Recs. LLC v. Lime Grp. LLC,* 784 F. Supp. 2d 398 (S.D.N.Y. 2011)................................21

*Barrows v. Becerra,* 24 F.4th 116 (2d Cir. 2022) ........................................................................29

*Bartz v. Anthropic PBC,* 791 F. Supp. 3d 1038 (N.D. Cal. 2025) .........................................27, 28

*Bateman v. Am. Multi-Cinema, Inc.,* 623 F.3d 708 (9th Cir. 2010)..............................................28

*Brecher v. Republic of Argentina,* 806 F.3d 22 (2d Cir. 2015).....................................................13

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.,* 196 F. Supp. 3d 395 (S.D.N.Y. 2016)...........23

*Comcast Corp. v. Behrend,* 569 U.S. 27 (2013) ......................................................................16, 24

*Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473 (2d Cir. 1995) .......................................16

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91 (2d Cir. 2007)..................15

*Crysknife Cap. v. Liberty Specialty Markets,* No. 22 CIV. 7912, 2023 WL 3255777 (S.D.N.Y. 2023) ...............................................................................................................................12

*David v. Showtime/Movie Channel, Inc.,* 697 F. Supp. 752 (S.D.N.Y. 1988)...............................24

*Davis v. The Gap, Inc.,* 246 F.3d 152 (2d Cir. 2001) ...................................................................25

*Dial Corp. v. News Corp.,* 314 F.R.D. 108 (S.D.N.Y. 2015) .......................................................18

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 (1991) ...........................................18, 26

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159 (2d Cir. 1971) .............21

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.,* 338 F.R.D. 205 (S.D.N.Y. 2021) ......................................................................................................19

*IBM Corp. v. Micro Focus (US), Inc.,* No. 22 CV 9910, 2023 WL 3902955 (S.D.N.Y. 2023)....12

*In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. 2014) ...............................................................................................................................17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29 (2d Cir. 2009).................................19

*In re Napster, Inc. Copyright Litig.,* No. C 04-1671, 2005 WL 1287611 (N.D. Cal. 2005) ...18, 24

*In re Petrobras Sec.,* 862 F.3d 250 (2d Cir. 2017) .......................................................................14

*In re Vitamin C Antitrust Litig.,* 279 F.R.D. 90 (E.D.N.Y. 2012) .................................................16

*Jermyn v. Best Buy Stores, L.P.,* 256 F.R.D. 418 (S.D.N.Y. 2009).............................................28

*Langan v. Johnson & Johnson Consumer Cos., Inc.,* 897 F.3d 88 (2d Cir. 2018).........................11

*Mahon v. Ticor Title Ins. Co.,* 683 F.3d 59 (2d Cir. 2012)..........................................................11

*Marisol A. v. Giuliani,* 126 F.3d 372 (2d Cir. 1997) .............................................................16, 18

*McGucken v. Shutterstock, Inc.,* 166 F.4th 361 (2d Cir. 2026) ................................................7, 26

*Myers v. Hertz Corp.,* 624 F.3d 537 (2d Cir. 2010)........................................................................15

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145 (2d Cir. 2012)....12

*Petrella v. Metro-Goldwyn-Mayer, Inc.,* 572 U.S. 663 (2014)..............................................12, 25

*Roach v. T.L. Cannon Corp.,* 778 F.3d 401 (2d Cir. 2015) ...........................................................26

*Seijas v. Republic of Argentina,* 606 F.3d 53 (2d Cir. 2010)........................................................27

*State St. Glob. Advisors Tr. Co. v. Visbal,* 677 F. Supp. 3d 209 (S.D.N.Y. 2023).......................21

*Sykes v. Mel S. Harris & Assocs. LLC,* 780 F.3d 70 (2d Cir. 2015)..............................................26

*Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442 (2016) ...............................................................21

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ...........................................................17, 29

**Rules & Statutes**

Fed. R. Civ. P. 23................................................................................................................. passim

Fed. R. Civ. P. 23(a) ...............................................................................................................2, 15–19

Fed. R. Civ. P. 23(a)(1).................................................................................................................2, 16

Fed. R. Civ. P. 23(a)(2).................................................................................................................2, 17

Fed. R. Civ. P. 23(a)(3).................................................................................................................2, 18

Fed. R. Civ. P. 23(a)(4).....................................................................................................................19

Fed. R. Civ. P. 23(b)(2).............................................................................................................2, 28–29

Fed. R. Civ. P. 23(b)(3)........................................................................................................2, 20, 26–28

Fed. R. Civ. P. 23(g)(1).....................................................................................................................29

15 U.S.C. §§ 512, 1201, 1202.............................................................................................................1

17 U.S.C. § 106(1), (3) .....................................................................................................................26

17 U.S.C. § 410(c) .............................................................................................................................23

17 U.S.C. § 412..................................................................................................................................25

17 U.S.C. § 504(b) .............................................................................................................................25

17 U.S.C. § 504(c) .............................................................................................................................25

**Other Authorities**

4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.08(C)(1) (Matthew Bender rev. ed. 2016) ...............................................................................................................................18

Plaintiff Cynthia Herrick ("Plaintiff" or "Herrick") respectfully submits this Memorandum of Law in support of her Motion for Class Certification under Federal Rules of Civil Procedure 23(a) and 23(b)(3).[1]

## I. INTRODUCTION

Defendant Shutterstock, Inc. ("Shutterstock") operates one of the world's largest stock-photography licensing platforms. Photographers and other content creators submit their copyrighted works to Shutterstock and Shutterstock vets each work. If the work meets Shutterstock's internal standards, Shutterstock subsequently makes the work available for licensing on its platform to its customers. Shutterstock's customers license those works and Shutterstock collects a licensing fee and pays a share of the fee to the contributor of the work.

This case arises from Shutterstock's business model for licensing copyrighted works that it admits it had the right and ability to supervise and control and for which it received a direct financial benefit. After Shutterstock received and accepted as valid a Digital Millennium Copyright Act, 15 U.S.C. sections 512, 1201, 1202  ("DMCA") takedown notice from a copyright holder that a contributed work was not owned by the person who had uploaded a copy of the work to Shutterstock for approval and licensing to Shutterstock's customers, Shutterstock admitted it generally removed that work from its platform. Receipt of a takedown notice regarding an infringed work established that any license Shutterstock sold for that work was void *ab initio* from the time the license was created. However, for those works that were removed and had generated licensing fees for Shutterstock, Shutterstock failed to stop their customers from infringing the work and failed to pay any licensing fees to the copyright holder. This action seeks to recover the actual and/or statutory damages that were owed to the copyright holders who did

---

[1] All references hereafter to "Rule __" are to the Federal Rules of Civil Procedure.

1

not authorize Shutterstock and its customers to exploit those works. Plaintiff now moves to certify a class of copyright holders whose rights were infringed by Shutterstock and its customers when Shutterstock unlawfully licensed copyrighted works, subsequently failed to pay the rightful copyright holder any of the licensing fees generated by Shutterstock and failed to stop their customers from infringing the works.

A class action on behalf of copyright holders is appropriate and the motion for class certification should be granted because all requirements of Rules 23(a), (b)(2) and (b)(3) are satisfied.  The proposed class is sufficiently numerous. The number of copyright holders who sent takedowns, suffered damages and seek injunctive relief from Shutterstock and its customers for the copyrighted Works at issue numbers in the thousands, making joinder impracticable for the number of class members. Rule 23(a)(1). There are questions of law (direct and vicarious copyright infringement) and fact (whether a proposed class member submitted a takedown notice for a work that generated revenue for Shutterstock and who were not paid any licensing fee and Shutterstock customers that continued infringing the work post-takedown) that are common to the class. Rule 23(a)(2). Plaintiff's claims are typical of members of the proposed class because Shutterstock licensed two of her copyrighted works without her authorization and without paying her the licensing fees or stopping its customers from infringing her works. She is represented by counsel well qualified to litigate this case. Rule 23(a)(3)-(4). Thus, Rule 23(a) is satisfied.

Further, this case is appropriate for certification under Rule 23(b)(3). The questions of law or fact are not only common to the class members but also predominate over any questions affecting only individual members. Liability here is uniformly premised objectively on Shutterstock's common business practices after it receives and accepts a takedown notice alerting it to copyright infringement, including its retention of direct monetary benefits it

2

received and what subsequent misconduct and uniform decisions it undertook regarding license agreements with its customer licensees to stop infringement of the works at issue.

Also, a class action is superior to other potential methods for fair and efficient adjudication of this dispute. Pertinent to the conclusion that certification is appropriate here is the relatively modest amounts at issue for each individual class member and the economics of individual cases, making it wholly impracticable, if not impossible, for members to invoke the legal process to recover their losses and stop Shutterstock's customers from exploiting the works. For example, a $405 filing fee for a federal complaint will in many instances exceed the sums wrongly retained by Shutterstock. This is the very type of factual scenario that the class action device was designed for, where the amount in controversy as to each individual class member may be insignificant to feasibly litigate on an individual basis, and the size of Shutterstock's licensing market is too substantial to be ignored or to deny copyright holders a vehicle for fair redress. The only practical way to address the wrongdoing is through a class action. Absent class treatment, Shutterstock will effectively escape any consequences for its wrongdoing and will continue to benefit from its wrongful conduct in the form of unlawful "licensing" revenue.

Lastly under Rule 23(b)(3), there will be no significant difficulties in managing this action as a class action. Essentially all pertinent information bearing on the claims is reflected in Shutterstock's data and US Copyright Office records. Notice to the class can be provided through cost-effective mechanisms, including emails to copyright holders, posing no insuperable difficulty in managing this action.

Absent certification, there will truly be a wrong without a remedy. Granting this motion does not relieve Plaintiff of her burden to establish the claims through a preponderance of the evidence. However, the case facts and Shutterstock's admissions strongly support providing the

3

opportunity to do so on behalf of all those affected by the challenged conduct. Accordingly, the Court should certify the proposed class, appoint Plaintiff Cynthia Herrick as Class Representative, and appoint Cera LLP, Duncan Firm P.A., and Hoben Law as Class Counsel.

## II. FACTUAL BACKGROUND

### A.      Plaintiff Cynthia Herrick

Plaintiff Cynthia Herrick, a wildlife photographer, owns two copyrighted photographs at issue in this action. *See* Cynthia Herrick Declaration ("Herrick Decl.") at ¶3. The first photograph, bearing U.S. Copyright Registration Number VA 2-291-805, is titled "Snowy Plover Baby's First Step" (the "Plover Photo"). *Id*. at ¶5. The second, bearing U.S. Copyright Registration Number VAu 1-461-254, is entitled "Snowy Flowy Egret" (the "Egret Photo"). *Id*. ¶6. Both works were registered with the U.S. Copyright Office before suit was filed. *Id*. ¶7. Both works were uploaded without authorization by a third party to Shutterstock's platform, licensed to Shutterstock customers for revenue, and despite a valid takedown notice, Shutterstock never stopped their customers from infringing the Photos. *Id*. ¶8.

In January 2022, Herrick discovered that her Plover Photo was displayed and offered for licensing on Shutterstock's platform by a Shutterstock contributor account named "MTKhaledMahmud" with a Shutterstock designation of "High Usage." *Id*. ¶10. Shutterstock admits it "did not secure authorization from Plaintiff to exploit" the Plover Photo. *See* Declaration of Thomas C. Bright ("Bright Decl.") (Defendant's R&O to 1st and 2nd Set of Requests for Admission ("R&O to RFA")) Ex. A.  Herrick discovered that Shutterstock licensed her Plover Photo to its customer, Taylor & Francis, who copied, distributed and published it in a textbook titled *Human-Wildlife Interactions: From Conflict to Coexistence*. Herrick Decl. ¶15. The published textbook wrongly attributes the Plover Photo to "MTKhaledMahmud,

Shutterstock 1726619095"—Shutterstock's contributor account and image identifier appearing in the gutter credit beneath the Photo. *Id*. Ex. D. Herrick sent Shutterstock a DMCA takedown notice on January 24, 2022. *Id*. ¶13. Shutterstock removed the photo from its platform on January 31, 2022. Bright Decl. Ex. A, (R&O to RFA) No. 3. Shutterstock processed Herrick's DMCA notice and accepted it as valid, took the Plover Photo down from its platform, and confirmed its contributor's lack of authority. Bright Decl. Ex. A (R&O to RFA) No. 3; Bright Decl. Ex. B (Depo. of Heather Shimmin ("Shimmin Dep")) 40:16–22; 41:3–7. However, Shutterstock admits that "it did not void the license agreement with Taylor & Francis." Bright Decl. Ex. A (R&O to RFA) No. 5; Bright Decl. Ex. B (Shimmin Dep) 88:13–16; 202:13–20. Shutterstock admits it never sent Taylor & Francis a kill notice at the time of Herrick's takedown. Bright Decl. Ex. B (Shimmin Dep) 88:13–16 (confirming Shutterstock does not notify customers who acquired a license when a DMCA notice is received); 202:13–20 (confirming no kill notice was sent at the time of the January 2022 takedown). It was not until May 31, 2024— more than two years after Herrick's takedown notice and in the middle of this action—that Shutterstock finally sent kill notices to its 12 downstream customer licensees for Herrick's Plover Photo. *Id.* Shutterstock's own Assistant General Counsel *curiously* admitted this happened only because he "was in the process of gathering information for discovery in this case and recognized that we had not sent any kill notices to the [12] customers who downloaded these two images." Bright Decl. Ex. C (Depo. of Andrew Raff ("Raff Dep.")) 153:19–154:14.

Herrick also demanded to be paid the income Shutterstock made from licensing her work. Herrick Decl. ¶ 14 (Ex. C); Bright Decl. Ex. B (Shimmin Dep. at 196:1–6) (confirming Herrick asked Shutterstock to "compensate any profits made by providing the image as a royalty-free download"). Shutterstock admits it "received revenue related to the subject photograph." Bright

5

Decl. Ex. A (R&O to RFA) No. 6. Shutterstock ignored Herrick's demand and retained the revenue from the void license. Herrick Decl. at ¶14; Bright Decl. Ex. B (Shimmin Dep) 197:8–10; Bright Decl. Ex. C (Raff Dep) 115:1–4.

### B.    Defendant Shutterstock, Inc.

Shutterstock is a publicly traded company that operates a licensing platform. As Shutterstock's senior IP agent testified, "Shutterstock is a licensing company, licenses artists' work to third parties." Bright Decl. Ex. B (Shimmin Dep) 20:7–8. It markets and sells licenses for photographs, illustrations, vectors, and videos, generally in the form of subscription packages or individual licenses, through an online platform populated by a global community of contributors. Bright Decl. Ex. B (Shimmin Dep) 13:1–4; Bright Decl. Ex. D (Depo. of Artur Zambrowski ("Zambrowski Dep") 13:1–7. Shutterstock's Assistant General Counsel confirmed that "Shutterstock operates a two-sided marketplace. We license content from contributors and also entered sales agreements for customers to license content that's uploaded by those contributors." Bright Decl. Ex. C (Raff Dep) 21:15–19. A "contributor" is "any artist that submits their content to Shutterstock to be licensed to third parties." Bright Decl. Ex. B (Shimmin Dep) 23:19–20; *see also* Bright Decl. Ex. D (Zambrowski Dep.) 14:12–15 ("A contributor is a user who submits content to the Shutterstock platform.").

### C.    Shutterstock Controls the Entire Licensing & Kill Notice Process

Shutterstock operates a licensing platform that is not merely a passive transmitter in a marketplace for contributors and potential licensees. Rather, Shutterstock boasts an expansive online repository of digital images, vectors, illustrations, and videos that it actively licenses from its platform to its customers worldwide, managing millions of licensed images, videos, and music tracks, with a global network reaching customers in over 150 countries and generating

6

billions in licensing fees.[2] Shutterstock handles, selects, supervises, approves, and vets every work on its licensing platform; is the principal licensor of Works; retains contractual authority to supervise and send kill notices directing customer licensees to cease use of Works; and maintains complete records of every license issued and has "exclusive decision-making authority when it comes to approving or rejecting content that's submitted." Bright Decl. Ex. D (Zambrowski Dep.) 16:7–12. "Nobody else has [that authority] except Shutterstock." *Id.* 16:13–16. Shimmin concurred: "Shutterstock gets to make decisions as to anything that is being sold on its site." Bright Decl. Ex. B (Shimmin Dep) 46:16–19.

Shutterstock admits its executives "have discussed in internal communications the risk of legal liability to its Licensee Customers who unknowingly use Images that were uploaded without proper authorization." Bright Decl. Ex. A (R&O to RFA) No. 17. Shutterstock further admits it "has received complaints from Licensee Customers who were not informed about the removal of Images they had licensed due to a DMCA takedown notice." Bright Decl. Ex. A (R&O to RFA) No. 18.  Shutterstock admits it "has received feedback from Licensee Customers expressing concern about the potential reputational damage from them unknowingly using Images that were not properly authorized by the rightful copyright holder." Bright Decl. Ex. A (R&O to RFA) No. 19.

Shutterstock's active operation exploits and financially benefits from copyrighted works of Plaintiff's and the class members.  As recently found by the Second Circuit, DMCA safe harbor immunity is unavailable to Shutterstock for conduct on its platform, which also logically means it is <u>not</u> immune for post-DMCA takedown conduct *off the platform. See McGucken v.*

---

[2] *See* https://www.shutterstock.com/blog/shutterstock-one-billion-licenses-sold (last checked April 17, 2026). Bright Decl. Ex. M.

*Shutterstock, Inc.*, 166 F.4th 361, 378 (2d Cir. 2026) (Concluding "Shutterstock has not met its burden to establish that, as a matter of law, images appear on its platform 'at the direction of a user' as required by § 512(c)(1)").

  **D.**  **Shutterstock's Uniform Conduct After Receiving Notice of Infringement**

  Plaintiff and each member of the class sent Shutterstock valid DMCA takedown notices identifying their copyrighted work as having been uploaded and licensed without authorization and requesting removal. Herrick Decl. ¶13; Bright Decl. Ex. B (Shimmin Dep.) 40:16–22; 41:3–7 (confirming "Shutterstock's policy regarding DMCA notices is to honor them even if they're not 100 percent compliant with the law"). Shutterstock generally accepted and processed each takedown notice as valid, removing or disabling the identified work from the Shutterstock platform. Bright Decl. Ex. B (Shimmin Dep.) 79:1–20 (confirming this workflow has been consistent "since April 2020"); Bright Decl. Ex. A (R&O to RFA) No. 8 (18,921 unique Works taken down). The takedown and acceptance of a DMCA notice established as an undisputed fact that the contributor who uploaded the work lacked authority and that any license Shutterstock sold for that work was void from inception. Shutterstock's standard license agreement (Section 5.5) expressly provides that Shutterstock has the absolute right to send kill notices and "stop" its customer licensees from infringement ("**Upon notice from Shutterstock… of infringement…..[customer] will remove the Content… and cease any future use")**. Bright Decl. Ex. A (R&O to RFA) Nos. 13, 14, 18; Bright Decl. Ex. E (Shimmin Dep.) Ex. 4 (Shutterstock standard license agreement.)  Raff, Shutterstock's Assistant General Counsel, confirmed that Shutterstock maintained records sufficient to identify every licensee customer of every void-license work. Bright Decl. Ex. A (R&O to RFA) No. 17 (Shutterstock "is generally able to identify a Licensee Customer who licensed a work that was later subject to a Takedown

Notice" and "is generally able to determine the contact information provided at the time the license was purchased"); No. 20 (Shutterstock "has the ability to review the licensing history for each image subject to a DMCA takedown notification"). Shutterstock admitted that it had the contractual authority and right under § 5.5 to supervise those customers and send kill notices that benefit the company. Bright Decl. Ex. C (Raff Dep.) 194:2–5 ("Q: So when you say 'it's to Shutterstock's benefit to do that,' you mean to send the kill notice? A: Correct."). Yet, Shutterstock systematically elected to not issue kill notices following a takedown for infringement. Shimmin, the senior IP agent who has handled DMCA cases since 2020, testified:

> Q: [W]hen a specific piece of content is licensed, it's Shutterstock's general policy that it's not going to send a kill notice to Shutterstock's customer?
> A: Generally, we don't send out a kill notice.

Bright Decl. Ex. B (Shimmin Dep.) 90:17–24.

She confirmed: "the policy is not to send a kill notice for every single takedown that we receive." *Id.* at 133:13–14.  Raff admitted that Shutterstock has no written policy and no checklist:

> Q: Does Shutterstock conduct a business risk assessment to determine whether to send a kill notice or not?
> A: We don't have a formal template or tool for judging business risk as a parameter. I look at this as something where we want to think about whether it's a—to understand what the situation is and look at each individual set of facts and the situation about each individual case, you know, in its own—in its own world.
> Q: That's done on a case-by-case basis, is that what you're saying?
> A: That's what I'm saying, yes.

Bright Decl. Ex. C (Raff Dep.) 183:21–184:13. And when pressed on why Shutterstock does not send kill notices every time despite acknowledging the benefit, Raff could not offer a credible explanation: "I don't know." *Id*. at 194:6–8.

During the entire Class Period, Shutterstock rarely sent kill notices: only 359 Works for 5,096 Licensee Customers. Bright Decl. Ex. A (R&O to RFA) No. 15. That represents fewer than 2% of the 18,921 Works removed from the platform during the same period. *Id.* Ex. A

(R&O to RFA) Nos. 8, 15. For the remaining 98%—more than 18,500 Works for which 208,314 licenses had been issued—Shutterstock made the decision to take no action whatsoever to notify its downstream licensees. This admission—that Shutterstock had the sole contractual authority (right), the records, the mechanism (ability), and the acknowledged benefit of acting as well as supervisory rights, but chose not to for 98% of affected Works—is the common thread running through every class member's claim. Instead of exercising its right and ability, Shutterstock, as the "licensor" for each Work retained the licensing revenue it had collected, paid no portion of that revenue to the copyright owners and affirmatively permitted its customer licensees using void licenses to continue to infringe. Bright Decl. Ex. B (Shimmin Dep.) 93:1–7; Bright Decl. Ex. F (Shimmin Dep.) Ex. 3 at p. 7. Shutterstock's internal DMCA processing guide confirms this gap was by design. The guide's 12-step workflow contains no step for checking whether a removed Work was previously licensed, no step for sending kill notices, and no step for flagging revenue owed to the rights holder. Bright Decl. Ex. F (Shimmin Dep. Ex. 3). Shutterstock's own internal policy confirms the threshold for accepting a takedown is minimal and uniform: a statement of ownership and a link to the work. Bright Decl. Ex. B (Shimmin Dep.) 41:3–7; Bright Decl. Ex. F (Shimmin Dep. Ex. 3). The minimal bar for takedowns undercuts any "individualized validity" defense.

Ms. Herrick's experience with Shutterstock and its licensee, Taylor & Francis, is an example of this common practice and demonstrates why a class should be certified. After Herrick's takedown notice was processed and confirmed as valid, Shutterstock admits that it allowed CRC Press to continue to sell copies of the textbook that infringed the Plover Photo attributed to Shutterstock's contributor account. Shutterstock admits it "did not void the license agreement with Taylor & Francis." Bright Decl. Ex. A (R&O to RFA) No. 5. Zambrowski, who

10

handled the CRC Press (Taylor & Francis) correspondence, testified that his October 2023 communication was, "from my understanding . . . the first time we received notice about this" from Taylor & Francis's perspective—confirming that Shutterstock had not previously notified Taylor & Francis. Bright Decl. Ex. D (Zambrowski Dep.) 153:20–25. *See also* Herrick Decl. at ¶17 (Ex. E). Another example of a Shutterstock licensee (*redacted* publisher) from June 2024 shows that 8,430 copies of a textbook remained in print that included Herrick's Photo. Bright Decl. Ex. G (Shimmin Dep. Ex. 27); Bright Decl. Ex. C (Raff Dep.) 170:1–171:22 (confirming figures – names *redacted*). Every sale after Herrick's takedown notice constituted infringement for which Shutterstock, as the licensor, bears direct and vicarious liability.

This case fits neatly within the requirements for class certification. A single defendant applied a single post-notice policy — documented in its own internal workflow, executed by a two-person team, and reflected in its own records — to thousands of copyright holders over many years. Every element of liability and input for damages comes from the same source of evidence. Shutterstock's admissions and records confirm that class treatment is warranted.

## III. ARGUMENT

### A.    The Prerequisites for Class Certification are Satisfied

#### 1    Plaintiff Has Article III and Class Standing.

Plaintiff and members of the proposed Class have Article III standing. "[A] plaintiff must demonstrate (1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely redress." *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d Cir. 2018) (quoting *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012)). In the Second Circuit, the plaintiff must plausibly allege (1) that it "personally has suffered some actual injury as a result of the putatively illegal conduct of the defendants,"

and (2) that "such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012).

Plaintiff's infringement claim rests on proof of two elements: ownership of a valid copyright and unauthorized copying. *IBM Corp. v. Micro Focus (US), Inc.*, No. 22 CV 9910 (VB), 2023 WL 3902955, at *6 (S.D.N.Y. June 8, 2023). Shutterstock admits it "did not secure authorization from Plaintiff to exploit" the Plover Photo. Bright Decl. Ex. A (R&O to RFA) No. 1. Shutterstock accepted Herrick's takedown notice and removed the photo on January 31, 2022. Bright Decl. Ex. A (R&O to RFA) No. 3. Every unauthorized license issued by Shutterstock must be deemed void *ab initio*, and Shutterstock is liable for infringement each time it allowed the continued use of a pirated Work under a Shutterstock-issued "license" after knowing about infringement. *Crysknife Cap. v. Liberty Specialty Markets*, No. 22 CIV. 7912 (KPF), 2023 WL 3255777, at *15 (S.D.N.Y. 2023).  Shutterstock received Herrick's takedown notice, accepted and confirmed its validity, retained the licensing revenue from the now-void licenses, and failed to send kill notices to its downstream licensee/customers—leaving its licensees to continue infringing the Plover Photo under licenses Shutterstock had rendered void. Shutterstock admits it "received revenue related to the subject photograph" Bright Decl. Ex. A (R&O to RFA) No. 6 and admits it "did not void the license agreement with Taylor & Francis" Bright Decl. Ex. A (R&O to RFA) No. 5. Shutterstock is vicariously liable for each such post-notice act of infringement. It had the contractual authority and operational right to supervise its customers and stop infringement but did not. Each such act constitutes a separate, continuing injury under the independent-accrual rule. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014).

12

Plaintiff Herrick suffered actual injury when her copyrighted Photos were uploaded to Shutterstock without her permission by a third party and Shutterstock subsequently sold licenses for those works, retaining all resulting revenue. Herrick Decl. ¶¶13-14, 17, 18. After receiving her valid takedown notice, Shutterstock took down the Plover Photo but did not pay Herrick any fees generated from the void licenses despite her demand. *Id.*; Bright Decl. Ex. B (Shimmin Dep.) 196:1–6. Members of the proposed class suffered the same injury from the same course of conduct. Plaintiff possesses both Article III standing and class standing.

## 2. The Class is Ascertainable.

Second Circuit precedent identifies "ascertainability" as an "implied requirement" for class certification under Rule 23. *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id*. at 24–25. The proposed class satisfies this standard.

The class definition employs three (3) objective, record-based criteria for membership: (1) the class member owns a work registered with the United States Copyright Office; (2) the class member submitted a DMCA takedown notice to Shutterstock during the Class Period; and (3) Shutterstock's records reflect that at least one license was sold for the Work prior to the takedown notice.  Each criterion is easily determinable without any individualized merits inquiry, and all are proven and verifiable directly from Shutterstock's own records. Shutterstock admitted that it can identify class members from those records:

- Interrogatory No. 17: Shutterstock "is generally able to identify a Licensee Customer who licensed a work that was later subject to a Takedown Notice" and "is generally able to determine the contact information provided at the time the license was purchased."
- Interrogatory No. 20: Shutterstock "has the ability to review the licensing history for each image subject to a DMCA takedown notification and can therefore identify the Licensee Customers who purchased a license to that particular image."

13

- Interrogatory No. 21: Shutterstock "is able to issue 'kill notices' concerning Works that are subject to Takedown Notices."

Bright Decl. Ex. H (Defendant's R&O to 1st & 2nd Set of IROGS ("R&O to Rogs)) Nos. 17, 20-21.  Shutterstock has this data: "We'd have to run a report on every DMCA—every image that was removed per a DMCA and see if they were ever licensed." Bright Decl. Ex. B (Shimmin Dep.) 115:5–7. Raff confirmed that Shutterstock's Looker reporting system contains complete licensing and revenue data needed to identify and quantify each class member's claim. Bright Decl. Ex. C (Raff Dep.) 57:3–58:6.

Ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017). This "modest threshold" requires a "clear sense of who is suing about what," but is not concerned with plaintiffs' "ability to offer proof of membership under a given class definition." *Id.* at 269. The proposed class definition meets that threshold.

Additionally, Shutterstock's own testimony and records confirm that Shutterstock did not systematically pay the copyright owners the licensing revenue generated from void licenses following a takedown notice. Bright Decl. Ex. H (R&O to Rogs) No. 22 ("there is no written or standard policy as to when Shutterstock will share revenue information or provide payment to a rightsholder" and "[w]hether Shutterstock will remit payment to that rightsholder depends on several factors, including whether the rightsholder asks for payment"); Bright Decl. Ex. C (Raff Dep.) 115:1–4 (Shutterstock does not generally inform rights holders of royalty amounts); Bright Decl. Ex. B (Shimmin Dep.) 93:1–7 (earnings shared only if rights holder asks and signs an NDA) and Bright Decl. Ex. F (Shimmin Dep.) Ex. 3 ("**What if the complainant writes back in, wanting more information, such as royalties earned, how many licenses were issued, or the names of the clients who licensed the content?** Good question. Please refer to the post

14

Complainant Response to DMCA Notices, which I've [Shutterstock] not written yet but will soon. ☺")." The class is ascertainable.

**B.      The Class Certification Standards Are Met Here.**

The overall goal of Rule 23 is "to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (internal quotations removed). A proposed class must satisfy all the requirements of Rule 23(a) and one prong of Rule 23(b). *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99, 104 (2d Cir. 2007). Cases arising from a single course of conduct affecting large numbers of plaintiffs are particularly amenable to class treatment. See, e.g., *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  Rule 23(a) requires that: (1) the class "be sufficiently numerous," (2) the claims "involve questions of law or fact common to the class," (3) the representative plaintiffs have claims "typical of those of the class," and (4) the representative plaintiffs "adequately represent the interests of the class." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). Under Rule 23(b)(3), Plaintiff must also show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" for adjudicating the controversy. Plaintiff proposes an amended class definition from the Complaint to conform to the proof elicited during discovery:

> *All owners of works registered with the United States Copyright Office who submitted a takedown notice to Shutterstock seeking removal of such works from Shutterstock's platform during the period April 17, 2020 through the present, and where at least one license was sold by Shutterstock for a work prior to the takedown notice.*

> *Excluded from the Class are Shutterstock, Inc., its officers, directors, and employees, and their immediate families, and any copyright owner who received payment from Shutterstock resolving claims for the Work at issue.*

15

In addition to damages, the Class seeks injunctive relief requiring Shutterstock to issue kill notices under Section 5.5 of its standard license agreement to all customers for Works subject to accepted takedown notices.  A court must conduct a "rigorous analysis" to determine whether the Rule 23 requirements have been met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). However, Rule 23 does not permit "free-ranging merits inquiries at the certification stage," and merits questions "may be considered" only "to the extent that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466. "[T]he Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction." *See Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997).

### 1. Plaintiff Satisfies the Requirements of Rule 23(a).

#### a. The Class is Sufficiently Numerous.

Numerosity requires a class "so numerous that joinder of all members would be 'impracticable.'" *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 99 (E.D.N.Y. 2012) (quoting Fed. R. Civ. P. 23(a)(1)). In the Second Circuit, "numerosity is presumed at a level of 40" class members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). During the Class Period (April 17, 2020 through the present), Shutterstock admits receiving 4,647 DMCA takedown notices and processing these notices as valid and removing 18,921 unique Works from its platform. Bright Decl. Ex. H (R&O to Rogs) Nos. 6, 8. Those notices came from rightful copyright owners—the class members. Shutterstock's discovery responses confirm that Shutterstock can easily identify every class member from its records. *Id.* Ex. H ("R&O to Rogs) No. 17 (Shutterstock "is generally able to identify a Licensee Customer who licensed a work that was later subject to a Takedown Notice" and can determine their contact information); *Id.* Ex. H ("R&O to Rogs) No. 20 (Shutterstock "has the ability to review the licensing history for each

16

image subject to a DMCA takedown notification"); Bright Decl. Ex. B (Shimmin Dep.) 115:5–7;

Bright Decl. Ex. C (Raff Dep.) 57:3–58:6. With over 4,600 takedown-notices and nearly 19,000

works removed, the class is far too numerous for joinder to be practicable. Numerosity exists.

Discovery also shows that out of the 14 subpoenas sent to class members as a sample, 7 (*or 50%*)

resulted in documents confirming class members registered their Works with the U.S. Copyright

Office.  Bright Decl. at Ex. I (U.S. Copyright Office Registrations class sampling ("Regs.").

### b. There are Many Questions of Law and Fact Common to The Class.

Rule 23(a)(2) commonality is not "a particularly exacting standard." *In re Air Cargo

Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *30 (E.D.N.Y.

Oct. 15, 2014). A common question is one "of such a nature that [it] is capable of class-wide

resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011). A single significant issue common to the class suffices. *Id.* at 359.

This case presents multiple common questions, each resolvable on a classwide basis: (1)

Whether Shutterstock's acceptance and processing of a valid DMCA takedown notice

established that any previously-issued license for the affected Work was void from inception; (2)

Whether Shutterstock had both the contractual authority and the operational capacity (the "right

and ability" element of vicarious liability) to supervise and send kill notices to all its downstream

customer licensees of void-license Works following receipt of a valid takedown notice; (3)

Whether Shutterstock's decision to not send "kill notices" systematically—for 98% of affected

Works—constitutes copyright infringement of each class member's exclusive rights in the

Works; (4) Whether Shutterstock retained licensing revenue (the direct financial benefit element

of vicarious liability) that should be paid to copyright owners of the Works; and (5) Whether

17

damages are calculable on a classwide basis from Shutterstock's own records. Each of these questions will be answered through common evidence—Shutterstock's uniform practices, its discovery responses and admissions, the testimony of Raff, Shimmin, and Zambrowski, and Shutterstock's own records—not through individualized inquiry.

Copyright infringement consists of only two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). It is a strict liability offense. See, e.g., 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.08(C)(1) (Matthew Bender rev. ed. 2016). Every class member that registered their work within five (5) years of first publication is presumed to own the copyright to the work for which they sent a valid takedown notice that Shutterstock accepted—a common factual predicate established by the takedown and confirmed by Shutterstock's own records along with records of the US Copyright Office. See *In re Napster, Inc. Copyright Litig.*, No. C 04-1671 MHP, 2005 WL 1287611, at *3 (N.D. Cal. June 1, 2005). Commonality is satisfied.

### c. Plaintiff's Claims Are Typical of The Class Claims.

Plaintiff's claims satisfy Rule 23(a)(3)'s typicality requirement. Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "[F]actual differences in the amount of damages, date, size or manner of purchase, the type of purchaser . . . and other such concerns will not defeat class certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class." *Air Cargo*, 2014 WL 7882100, at *31.

18

Herrick's claims are typical of the class. She is a copyright owner of a Work who sent Shutterstock a valid DMCA takedown notice. Shutterstock processed that notice as valid and took the Work down from its platform—confirming that Shutterstock decided that the contributor lacked authority to copy the Work onto the platform. Shutterstock decided not to issue a kill notice to the 12 downstream customer/licensees of the Plover Photo and admitted to retaining the licensing revenue from void licenses without paying Herrick. Bright Decl. Ex. B (Shimmin Dep.) 221:12. Each class member was uniformly exposed to the identical sequence of Shutterstock's business decisions: acceptance of a valid takedown, removal from the platform, retention of revenue and an affirmative decision to not stop its downstream customer licensees from continuing infringement of the Work. Because Plaintiff's Works were subject to the same post-notice infringing conduct that impacted all other class members, typicality is satisfied.

### d. Plaintiff Will Adequately Represent the Class.

The fourth prong of Rule 23(a) mandates that parties seeking to certify a class demonstrate that the named plaintiffs will "fairly and adequately" represent that class. Rule 23(a)(4). "Adequacy has two components: '[f]irst, class counsel must be qualified, experienced and generally able to conduct the litigation,' and '[s]econd, the class members must not have interests that are antagonistic to one another.'" *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. Mar. 30, 2021). To defeat certification on adequacy grounds, any conflicts must be "fundamental." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).

Plaintiff Herrick will adequately represent the class. First, she has no conflict with absent class members. Herrick Decl. ¶19. Herrick alleges that Shutterstock accepted her valid takedown notice and then failed to send kill notices and to stop 12 downstream Shutterstock customer

19

licensees from continued use of the Plover Photo, retaining licensing revenue from void licenses without paying her. All class members share a common interest in establishing Shutterstock's uniform post-notice decisions and obtaining either disgorgement of licensing revenue Shutterstock retained plus a licensing fee (based on Shutterstock's own fee structure) or elect statutory damages. No fundamental conflict exists between Herrick and any class member on liability or a member's right to elect statutory or actual damages. Plaintiff Herrick has stayed abreast of case developments, provided detailed interrogatory responses, searched for and produced all responsive documents, given deposition testimony, attended depositions of Shutterstock's witnesses, and assisted counsel in understanding Shutterstock's business model. *Id.* ¶¶ 19-26. She is willing to testify at trial. *Id*.

Second, the proposed class is represented by counsel who have skillfully and effectively litigated this case and have significant experience in complex copyright and class action litigation. Since this case was filed in April 2023, Plaintiff's Counsel has successfully defeated a motion to dismiss, vigorously pursued discovery, analyzed tens of thousands of pages of documents, and taken and defended depositions of multiple witnesses. Bright Decl. ¶2.

### 2.     Plaintiff Satisfies the Predominance Requirements of Rule 23(b)(3)

To obtain certification of a class under Rule 23(b)(3), Plaintiff must show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). This test is clearly met.

### a.   Questions of Law and Fact Predominate.

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453

(2016). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453–54. Predominance is "a test readily met" where the primary factual and legal questions center on the defendant's course of conduct. See *Amchem*, 521 U.S. at 625. That is precisely this case. The central issue—whether Shutterstock systematically failed to stop infringement and issue kill notices to its customer licensees after receiving and processing valid DMCA takedown notices— is a question answerable in "one stroke" from a single body of evidence: Shutterstock's uniform practice consistently applied by its IP team across the entire Class Period. The evidence is overwhelming and undisputed: kill notices were sent for only 359 of 18,921 works removed— fewer than 2%. Bright Decl. Ex. H (R&O to Rogs) No. 15; Ex. B (Shimmin Dep.)  90:17–24; 133:13–14; Ex. C (Raff Dep.) 175:1–2; 182:7–8; 183:21–184:13.

Plaintiff's prima facie case of vicarious copyright infringement will be supported by common proof. "To establish liability, a plaintiff must show that the defendant '[1] had the right and ability to supervise the infringing activity and . . . [2] has a direct financial interest in such activities.'" *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 434–35 (S.D.N.Y. 2011) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)); *see also State St. Glob. Advisors Tr. Co. v. Visbal*, 677 F. Supp. 3d 209, 264 (S.D.N.Y. 2023). Both elements are common to the class and predominate here.

Regarding the right and ability prong of vicarious liability, Shutterstock has undisputed contractual authority (the right) under § 5.5 of its standard license agreement—a term present in every license issued for every class member's work—to supervise customers and send kill

21

notices to them directing them to stop infringement based on a void-license. Bright Decl. Ex. B (Shimmin Dep.) 122:4–23; 125:6–13 (confirming the license provides "you will remove the Content"); 103:2–4 ("Shutterstock has that right"); Ex. H ("R&O to Rogs) No. 21 (Shutterstock "is able to issue 'kill notices' concerning Works that are subject to Takedown Notices"). Shutterstock maintains records of every license issued (and email address) for every customer/licensee. *Id.* Ex. H ("R&O to Rogs) No. 20. Its IP team—two senior agents supervised by one attorney—is the single decision-making body that handled every post-takedown notice determination during the Class Period. *Id.* Ex. B (Shimmin Dep.) 37:15–16 ("It's a very small team. It's Artur and I."); 77:18–22 (same team since April 2020); *Id.* Ex. C (Raff Dep.) 30:7–10. Shutterstock itself identified the uniform factors it considers. *See supra*, *Id.* Ex. H ("R&O to Rogs) No. 16. These are the same factors applied by the same team. Critically, Shutterstock's own witnesses conceded that not sending kill notices results in continued infringement:

Q: [I]t's to Shutterstock's benefit to do that, to inform customers of that directly rather than them receiving demand letters from rights holders directly and/or dealing with litigation or areas where it's much more costly for Shutterstock to have to indemnify? A: [Yes.]

*Id.* Ex. C (Raff Dep.) 193:5–14.

And Zambrowski confirmed the obvious consequence of inaction:

Q: When Shutterstock receives a DMCA takedown notice, and has knowledge of infringement, and does not send a kill notice to its customer, isn't it true that the customer will most likely keep exploiting the work without being told to stop using it? A: To the best of my knowledge, yes.

*Id.* Ex. D (Zambrowski Dep.) 103:11–20.

Shutterstock admits it "has received complaints from Licensee Customers who were not informed about the removal of Images they had licensed due to a DMCA takedown notice from a copyright holder." *Id.* Ex. A (R&O to RFA) No. 18. Shutterstock itself identified the factors it considers for kill-notice decisions — the same factors, applied by the same two-person team, to

22

every notice. *Id.* Ex. H (R&O to Rogs) No. 16; (Shimmin Dep.) 37:15–16. A process yielding the same result for 98% of Works is a common practice, not an individualized one.

As to the direct financial interest prong, Shutterstock retained up to 85% of all licensing revenue from the void licenses. *Id.* Ex. B (Shimmin Dep.) 94:4–11; 97:4–18; Ex. C (Raff Dep.) 59:7–8. That financial interest is classwide, documented in Shutterstock's own system, and represents significant revenue for works alone, generated from 208,314 licenses. *Id.* Ex. H ("R&O to Rogs) Nos. 9, 11. Shutterstock admits it received this revenue. *Id.* Ex. A (R&O to RFA) No. 6. Neither element requires individualized merits-based proof.

First, each member of the proposed Class owns the copyright to a Work that was registered with the U.S. Copyright Office as required by the class definition. Ownership is demonstrated through Copyright Office registration records. 17 U.S.C. § 410(c). "A certificate of registration from the U.S. Register of Copyrights constitutes prima facie evidence of the certificate holder's copyright ownership." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 401 (S.D.N.Y. 2016).

Second, Shutterstock's post-notice decision not to send kill notices to its licensees and stop infringement is a uniform practice applying identically to all class members. See *supra*. Shutterstock also admits that "there is no written or standard policy as to when Shutterstock will share revenue information or provide payment to a rightsholder" and that "[w]hether Shutterstock will remit payment to that rightsholder depends on several factors, including whether the rightsholder asks for payment." *Id.* Ex. H ("R&O to Rogs) No. 22. This is no defense to the common systematic wrongdoing Shutterstock committed. The obligation to account for and pay runs to Shutterstock regardless of whether a demand is made for revenue from infringement. Moreover, Shutterstock's practice of retaining ill-gotten gains is itself a

23

uniform, classwide practice—the same approach applied by the same IP team to every class member. It does not introduce individualized questions; it confirms that predominating common conduct is the engine of every class member's claim. The fact that each class member's specific Work is different does not defeat predominance. *Leiber v. Bertelsmann AG (In re Napster, Inc. Copyright Litig.)*, No. C MDL-00-1369, 2005 WL 1287611, at *7 (N.D. Cal. June 1, 2005); *David v. Showtime/Movie Channel, Inc.*, 697 F. Supp. 752, 757 (S.D.N.Y. 1988).

Nor does Shutterstock's limited payments to a tiny percentage of copyright owners create individualized liability questions. Shimmin testified that in 2025, only five complainants had been paid their earnings—and described as "it rarely comes up." *Id.* Ex. B (Shimmin Dep.) 93:10–11; 95:17. Payment goes to damages arithmetic, not predominating liability questions.

At the certification stage, the predominance inquiry looks to whether "damages are susceptible of measurement across the entire class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Plaintiff's damages model satisfies *Comcast*. It is tied directly to both the accepted takedown notice and revenue earned from those "licenses" and the kill-notice liability for failing to stop continuing infringement. The licensing revenue Shutterstock collected from void licenses and retained after receiving valid takedown notices involves a single methodology to the entire class using data from Shutterstock's own business records.

The proposed damages methodology operates on two noncompeting tracks consistent with the Copyright Act's damages regime. Class members with timely registrations satisfying 17 U.S.C. § 412 can seek either statutory damages under 17 U.S.C. § 504(c) or actual damages under 17 U.S.C. § 504(b). Statutory damages are calculated arithmetically: the number of infringed Works multiplied by a per-work statutory amount up to $150,000 for willful infringement. *See* 17 U.S.C. § 504(c). Class members with untimely registrations may seek

24

actual damages, measured by the fair market value of the license the copyright holder could have obtained, which if licensed through Shutterstock is precisely what Shutterstock charged its customers based on a license, fully documented in Shutterstock's Looker reporting system. *Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001). Additionally, they can seek disgorgement of profits under § 504(b), which measures the infringer's profits directly attributable to the infringement. All inputs for actual damages come from a single source—Shutterstock's Looker reporting system—and require no individualized inquiry.

The continuing infringement doctrine further supports predominance. Under the separate-accrual rule, each infringing act following an accepted takedown notice triggers a separate accrual for damages. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671 (2014). Each post-notice use of a class member's Work under a void Shutterstock "license" by a Shutterstock customer is a separate act of infringement that Shutterstock could and should have easily stopped by sending a kill notice under §5.5 of the license agreement. Whether each post-takedown notice use was infringing is answered by the same common evidence: Shutterstock's uniform practice of taking down Works from its own platform but not sending kill notices to its customers to stop them from infringement—a practice applied to 98% of all Works removed. Bright Decl. Ex. H (R&O to Rogs) No. 15.

Moreover, while individual compensatory damages may vary based on the licensing volume of each Work with Shutterstock's customers, such damages are readily calculable from Shutterstock's own business records. "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81–82 (2d Cir. 2015). See *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).

25

Shutterstock is also directly liable for infringement. As the Second Circuit held in *McGucken v. Shutterstock, Inc.*, 166 F.4th 361, 378 (2d Cir. 2026), Shutterstock is not a passive platform — it actively and directly licenses and distributes works to its customers. Each license issued for a Work uploaded without authorization constituted direct infringement by Shutterstock through reproduction and distribution to its customers. 17 U.S.C. § 106(1), (3). Direct infringement is a strict-liability offense requiring no showing of intent or knowledge, further confirming that liability is resolvable on a classwide basis. See *Feist*, 499 U.S. at 361.

### b.    A Class Action is the Superior Method for Proceeding

Rule 23(b)(3) requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Courts consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). There can be no debate that a class action is the superior method of adjudication where thousands of common claims are at issue. It would be economically irrational for class members to incur the expense of bringing their own case against a well-funded defendant with substantial resources, especially considering the comparatively modest individual amounts at issue. The "superiority" requirement is frequently satisfied when it's prohibitively expensive for class members to proceed individually. See *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).

Each of the Rule 23(b)(3) factors supports certification. First, there is no evidence that class members are desirous of individually controlling their own actions, and the expense of

26

doing so would be prohibitive. Rule 23(b)(3)(A). Second, Counsel is unaware of any significant number of other cases concerning this controversy already begun by or against any class members.  Rule 23(b)(3)(B).  Thirdly, concentration in this Court—which has managed this action since its filing in April 2023—is clearly desirable. Rule 23(b)(3)(C). Finally, there will be no overriding difficulty in managing this action as a class action. Rule 23(b)(3)(D). All class members can be easily identified and notice provided from Shutterstock's own records; Shutterstock admits it can identify its customer licensees and class members' contact information from Shutterstock's records. Bright Decl. Ex. H (R&O to Rogs) No. 17; Ex. C (Raff Dep.) 57:3–58:6; Ex. B (Shimmin Dep.) 115:5–7.

The principle animating superiority here was stated emphatically in the recent copyright class certification decision in *Bartz v. Anthropic PBC*, No. C 24-05417 WHA (N.D. Cal. July 17, 2025). There, the court certified a class of copyright owners whose works were downloaded from pirated libraries by an AI company—a case involving millions of copyrighted works, a single defendant's uniform course of conduct, and individual claims for damages. In granting certification, Judge Alsup observed:

> There is no serious prospect that these claims can be addressed through individual actions. A denial of a motion to certify the class would amount to a concession that copyright owners' credible allegations of infringement will go unchecked by courts so long as a copyist allegedly violates the Copyright Act not a little but a whole lot. . . . *It cannot be true that as the scope of copying grows, so does the impunity.*

*Bartz v. Anthropic PBC,* 791 F. Supp. 3d 1038, 1064 (N.D. Cal. 2025) (emphasis added). The same reasoning applies with equal force here. No rational copyright owner would spend thousands of dollars necessary to litigate an individual infringement case to recover modest individual damages. Yet the aggregate harm is substantial, and Shutterstock's uniform post-notice scheme of retaining revenue from void licenses while declining to exercise its contractual

27

authority to supervise and halt ongoing infringement should <u>not</u> go unchecked simply because each individual claim is modest. "[I]f the size of a defendant's potential liability alone was a sufficient reason to deny class certification, ... the very purpose of Rule 23(b)(3) — 'to allow integration of numerous small individual claims into a single powerful unit' — would be substantially undermined." '*Bartz v. Anthropic PBC* at 1063 (quoting *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722 (9th Cir. 2010)).

Class treatment is the only viable means by which the claims of Shutterstock's infringements applicable to a large group of copyright owners will be heard and a fair remedy sought. *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436 (S.D.N.Y. 2009). In the absence of certification, the viable claims of thousands of copyright owners will never be addressed, and Shutterstock will benefit from infringement it had the duty and ability to supervise and stop.

### 3.    The Proposed Class Satisfies Rule 23(b)(2)

Class certification seeking injunctive relief is appropriate under Rule 23(b)(2) where, as here, "the party opposing class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011) (cleaned up). Importantly, there is no predominance requirement with respect to a Rule 23(b)(2) class. *See Id.* at 362-63 ("The procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are ... unnecessary to a (b)(2) class. When a class seeks an indivisible injunction benefiting all its members at once, there is no reason to undertake a case-specific

inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute."). "Rule 23(b)(2) does not require that the relief to each member of the class be identical, only that it be beneficial. Different class members can benefit differently from an injunction." *Barrows v. Becerra*, 24 F.4th 116, 132 (2d Cir. 2022)(cleaned up).

Shutterstock's course of conduct makes final injunctive relief appropriate here. If Plaintiff prevails on her copyright claim, injunctive relief requiring Shutterstock to send kill notices to its customer licensees for Works subject to a takedown notice would inure to the benefit of all Class members. The proposed injunctive relief stops infringement of the Works.

**D. Class Counsel Should be Appointed To Represent the Class.**

Plaintiff requests that Cera LLP, Duncan Firm, P.A., and Hoben Law be appointed as Class Counsel. Rule 23(g)(1) provides that "a court that certifies a class must appoint class counsel" and instructs the Court to consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Proposed Class Counsel possess the experience, ability, and resources to prosecute these claims and should be appointed. They have invested significant time, effort, and money in investigating, preparing, and prosecuting this case at the expense of time spent on others matters. This has included: (a) organizing and analyzing tens of thousands of records produced by Shutterstock and a sampling of absent class members; (b) conducting depositions of Defendant's employees and defending the deposition of the Plaintiff; and (c) zealously advocating before this Court on behalf of copyright owners since the filing of the initial complaint in April 2023.

Bright Decl. at ¶2. These facts, as well as their decades of copyright, class action, and complex

litigation experience support their appointment. Bright Decl. Ex. J-L.

## IV. CONCLUSION

For the foregoing reasons, the Court should certify the Class under Rules 23(a), (b)(2),

and (b)(3); appoint Plaintiff Cynthia Herrick as Class Representative; and appoint Plaintiff's

counsel as Class Counsel.

Dated: April 17, 2026                                 Respectfully submitted,

                                                        **CERA LLP**

                                        By:  */s/ Thomas C. Bright*
                                              Thomas C. Bright (*pro hac vice*)
                                              tbright@cerallp.com
                                              Solomon B. Cera (*pro hac vice*)
                                              scera@cerallp.com
                                              50 California Street, Suite 1500
                                              San Francisco, CA 94111
                                              Tel: (415) 977-2229

                                              **DUNCAN FIRM, P.A.**
                                              James H. Bartolomei, III
                                              james@duncanfirm.com
                                              809 W. 3rd Street
                                              Little Rock, Arkansas 72201
                                              Tel: 501-228-7600

                                              **HOBEN LAW**
                                              Bryan D. Hoben, Esq.
                                              bryan@hobenlaw.com
                                              1112 Main Street
                                              Peekskill, New York 10566
                                              Tel: 347-855-4008

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause when it was filed via the Court's ECF, on April 17, 2026.

I declare under the penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

By: ___*/s/ Thomas C. Bright*___
Thomas C. Bright