UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK


CYNTHIA HERRICK, Individually and On

Behalf of All Others Similarly Situated,

     Plaintiff,

v.              Case No.: 1:23-cv-03191-JPC-SLC

SHUTTERSTOCK, INC.,

     Defendant.


DEPOSITION OF

HEATHER L. SHIMMIN 30(b)(1)

TAKEN ON

THURSDAY, APRIL 24, 2025

10:07 A.M.


DAVIS WRIGHT TREMAINE LLP

1251 AVENUE OF THE AMERICAS, 21ST FLOOR

NEW YORK, NEW YORK  10020





(800) 528-3335  NAEGELI DEPOSITION & TRIAL — Established 1980 —  NAEGELIUSA.COM

APPEARANCES


Appearing on behalf of the Plaintiff:

JAMES H. BARTOLOMEI III, ESQUIRE

THOMAS C. BRIGHT, ESQUIRE (via telephone)

Duncan Firm P.A.

809 West Third Street

Little Rock, AR  72201

(501) 228-7600

james@duncanfirm.com


-and-


BRYAN D. HOBEN, ESQUIRE

Hoben Law Offices

1112 Main Street

Peekskill, NY  10566

(347) 855-4008

bryan@hobenlaw.com

APPEARANCES (CONTINUED)


Appearing on behalf of the Defendant:

JAMES E. ROSENFELD, ESQUIRE

HILARY J. ORAN, ESQUIRE

Davis Wright Tremaine LLP

1251 Avenue of the Americas, 21st Floor

New York, NY  10020

(212) 603-6455

jamesrosenfeld@dwt.com

hilaryoran@dwt.com


Also Present:

Cynthia Herrick, Plaintiff (via Zoom)

Andrew Raff, Assistant General Counsel,

    Privacy & Security, Shutterstock, Inc. (Zoom)

Q.    So fair to say that Heather Shimmin works in the complaint department?

MR. ROSENFELD:  Objection to form.  You can answer.

THE DEPONENT:  No.  They're not always complaints.

BY MR. BARTOLOMEI:

Q.    Sometimes compliments?

A.    Yeah.

Q.    Or someone just needs something?

A.    Yeah.

Q.    Okay.  And you mentioned DMCA complaints; what is a DMCA complaint?

A.    So the -- the Digital Millenium Copyright Act has standards that if someone believes that their IP is being infringed, they can send us a notice.

Q.    And what is -- what type of IP?

A.    Regarding video, image, illustration, music; or it could be also their artwork, like physical artwork.

Q.    So we're on the same page today, does Shutterstock refer to the IP that you just mentioned as content?

A.    Shutterstock defines content as the -- the

types of assets that are available for license.

Q.    Okay.

A.    So that would be music, video, images, illustrations, and 3D models.

Q.    What about vectors?

A.    Yes.  That would fall under illustration; but yes, also vectors.

Q.    Okay.  And logos?

A.    Logos we don't -- they'd be lumped into the vector/illustration category.

Q.    So today, if I refer to content, you're going to know what I'm talking about?

A.    Yes.

Q.    Okay.  And if I use the word work, you know what work is?

A.    Yes.

Q.    And is it fair to say content and work could be used interchangeably?

A.    Yes.

Q.    Okay.  So just sometimes I may use content, sometimes I may use work.  I just want to make sure we're on the same page.

And it's true that Shutterstock designated Ms. Shimmin to be a corporate representative related to some topics that are outlined in the Amended

of the documents that were produced to Plaintiff in this case?

A.    No.

Q.    Who was?

A.    Andrew Raff, and I don't know who else.

Q.    What is Shutterstock?

A.    Shutterstock is a licensing company, licenses artists' work to third parties.

Q.    Does Shutterstock license any content that it owns?

A.    Yes.

Q.    And just so we're on the same page today, third parties are Shutterstock's customers?

MR. ROSENFELD:  Objection to form.  Vague. You can answer.

THE DEPONENT:  Yes.  So third parties would be any customer to which we would license that content.

BY MR. BARTOLOMEI:

Q.    Does Shutterstock also have relationships with other companies for the licensing of third party work?

A.    Yes.

MR. ROSENFELD:  Objection to form.  You can answer.

MR. ROSENFELD:  Objection to form. Leading.

THE DEPONENT:  There are many ways we do our best to verify that they're owner of the content or authorized.

BY MR. BARTOLOMEI:

Q.  **What are those ways that Shutterstock does its best to verify the ownership?**

A.  Upon signing up as a contributor, they represent and warrant that they are the copyright holder of all content that they submit.  We have lots of information, public facing information to help our contributors understand what that means. We have some technological measures in place to prevent fraud.  We have reports we run.  We look at the review process.

Q.  **Okay.  Let's break that down a little bit. You mentioned contributor; what is a contributor?**

A.  So a contributor is any artist that submits their content to Shutterstock to be licensed to third parties.

Q.  **Anyone can be a contributor?**

A.  No.  You have -- they have to be over 18.

Q.  **Okay.**

A.  And they can't have been terminated

Q.    Okay.  And tell me a little bit about Heather Shimmin's team?

A.    So Andrew Raff is our boss, and then my colleague Artur Zambrowski and I --

Q.    Okay.

A.    -- are the IP Team.

Q.    What's Mr. Zambrowski's title?

A.    It's the same as mine.

Q.    Same as yours.

A.    Yeah.

Q.    And who are the -- is there a team that you manage?

A.    No.

Q.    There's nobody below you?

A.    No.  It's a very small team.  It's Artur and I.

Q.    Okay.

A.    And then sometimes I have a colleague that will help us process DMCA notices.

Q.    What's that colleague's name?

A.    Louis Anndeherz.

Q.    When you say process DMCA notices, what does that mean?

A.    So we -- we work in Salesforce, and every email creates a case.  So either the person writes

committed fraud?

A.    What other factors?

Q.    Yes.  Facts?

A.    We look at the submission history.  We look at their portfolio.  We look at how -- you know, the types of content they're submitting.  If they have hits to other, you know, previously submitted content.  If we don't -- if we're confident that this -- this person is a bad actor, we terminate the account essentially.

Q.    Okay.  And does Shutterstock have DMCA notice policies?

A.    Yes.

Q.    Okay.  Can you generally describe those policies?

A.    Sure.  The policy is when we receive a DCMA, even if it's not a proper DMCA notice, so long as they've identified that it's their work that's being infringed, and we can verify that it's the same, you know, linked to their original work, and somehow identifying that it, they have a Shutterstock image ID, we remove the content.

Q.    And just so we're on the same page, if I refer to it as a DMCA takedown, sometimes it's called a request or a notice or a demand, you'll

understand what I'm saying?

A.   Yes.

Q.   Okay.  It sounds like Shutterstock's policies -- policy regarding DMCA notices is to honor them even if they're not 100 percent compliant with the law, is that fair?

A.   Yes.

Q.   Okay.  What are the basics that would be required for a DMCA notice, for Shutterstock to honor, that may not be enough for Shutterstock to take action on?

A.   We -- we only need three things really. The person identifying that it is their work; a link or a Shutterstock ID number; and a link to their original work, whether it's their portfolio, or they have their content on another stock site, just a way so we can identify and look at, you know, oh yeah, this is, you know, you can see both works.

Q.   So Shutterstock typically will honor a DMCA notice so long as the person says this is my work, right?

A.   We need to --

MR. ROSENFELD:  Objection. Mischaracterizes.  You can go ahead.

THE DEPONENT:  Yes, and they need to

final say as to if it's approved for licensing on Shutterstock, right?

A.   Yes.

Q.   Okay.  A contributor doesn't make that decision, correct?

A.   No.

Q.   And Shutterstock's customers don't make that decision, correct?

A.   No.

Q.   Okay.

MR. ROSENFELD:  I just want to state a continuing objection to the extent we're talking control, which is a legal concept, that it calls for legal analysis.

BY MR. BARTOLOMEI:

Q.   But Shutterstock gets to make decisions as to anything that is being sold on its site, isn't that fair?

A.   Yes.

Q.   Okay.  And Shutterstock's status as a service provider, that's only as good as its ability to respond to DMCA takedown notices, right?

MR. ROSENFELD:  Objection to form.  And calls for legal analysis.

THE DEPONENT:  Yeah.  That's a legal

they're infringing.  We only -- we would only notify them when it would be like not exactly, like a -- like an illustration where it's similar.  But when it's a clear case of infringement, we don't notify them.

It also creates -- they got to contact contributor support, it's going to go back to us, and it's not going to do anything.  And often, the contributor was notified by the complainant before the complainant reached out to us anyway, so the contributor knows already.

Q.   Who at Shutterstock makes the determination that it knows that it's infringement, to make the -- the decision you just mentioned?

A.   I guess whoever picks up the case, so it's going to be Artur or I, or whoever happens to pick up the case.

Q.   So who was on the IP Team in April of '20?

A.   Same; Artur and I.

Q.   So it's just been the two of you, Ms. Shimmin and Mr. Zambrowski, the last five years?

A.   Yeah.

Q.   Okay.  So it's fair to say that once the DMCA notice is received, and somebody within Shutterstock hits the orange suspend button, that

doesn't notify the contributor, right?

A.   Not unless we tick the box.

Q.   Okay.  What does suspend mean?

A.   It means it removes it from the -- the website, and it cannot be licensed anymore.

Q.   Okay.  It suspends the display of the content from Shutterstock?

A.   Well, it removes it from being able to be licensed.

Q.   Is that Shutterstock's position that that's the only thing that Shutterstock needs to do at this point when it receives --

MR. ROSENFELD:  Objection.

MR. BARTOLOMEI:  Hold on.

BY MR. BARTOLOMEI:

Q.   -- when it receives a DMCA notice?

MR. ROSENFELD:  Objection.  Calls for a legal analysis, but you can answer.

THE DEPONENT:  We -- we -- we look at the case, we remove the content, we let the contributor or the complainant know that the content has been withdrawn if we do, and then we close the case.

BY MR. BARTOLOMEI:

Q.   Okay.  The case is closed?

A.   The case is closed.  If they --

Q.   Okay.  And that's the general workflow when a DMCA notice is sent, so long as it matches those three categories we talked about earlier, or it strictly complies with the DMCA statute, right?

A.   I thought I just answered that one.  I mean we -- we receive the case, we look at it, we remove the content, we let the contributor know, and usually we never -- we let them know we closed the case, and we never hear back from the complainant. So that's usually the -- the workflow.  If they write back, we respond, but usually they never -- they write thanks, and that's it.

Q.   Well, that's typically how it's done --

A.   Yeah.

Q.   -- for all DMCA notices?

A.   Yeah.

Q.   Okay.  And that's the kind of practice that's been with the IP department with Shutterstock since April 2020, correct?

A.   Yes.

Q.   Can we jump to page 306?  At the top there are two red exclamations, and it reads, "The only time we notify a contributor is if the contributor account receiving the complaint is an agency or aggregator, such as Wirestock LLC.  We would let

details, change the Type to Legal Complaints and the Sub-type to DMCA notice."

Did I read correctly?

A.   Yes.  And I found a typo.  It should be complainant.

Q.   Okay.  Aside from the typo, is this accurate?

A.   Yes.

**Q.   And the case is closed, and Shutterstock has nothing else to do about the particular DMCA notice?**

A.   Not unless the -- the person writes back.

**Q.   And Shutterstock doesn't notify any of their customers who acquired a license for the content about a DMCA notice, correct?**

A.   No.

**Q.   Why is that?**

A.   Well, I mean, there's really nothing more at this point that we do.

**Q.   Isn't it true that at this point Shutterstock knows about infringement related to the content?**

A.   Not necessarily.

**Q.   Isn't it true that Shutterstock makes the determination that it is infringing content?**

notice to customers?

A.    Several things.  One, the complainant specifically asked us to do so, we would send one. We would send one if there were a lot of licenses. We usually don't send kill notices because the content usually has never been licensed.  And when we do send out kill notices, most of the time customers tell us that they never used the content anyway.

So yeah, so it's -- if they ask us to, if we perceive that there is -- there is a high amount of risk to the customer for using the content, we'll send out a kill notice, but usually we don't.  It creates more -- more customer unease, and more -- it's just not necessary to always -- to always send a kill notice.

Q.    So if we're only talking about when a specific piece of content is licensed, it's Shutterstock's general policy that it's not going to send a kill notice to Shutterstock's customer?

MR. ROSENFELD:  Objection to form.  You can answer if you understand.

THE DEPONENT:  Generally, we don't send out a kill notice.

BY MR. BARTOLOMEI:

guideline, but we have guidelines in place.  I just want to emphasize this was for one single person.

Q.   This was -- this was for one single person with a six-month contract, right?

A.   Yes.  Yes.  And if it came up, which it did once, we -- we went through it together, so.  I just really want to emphasize that this was written for a single contractor to help us out.

Q.   And it's not written -- well, strike that.

It was written after the plaintiff filed the lawsuit in this case, correct?

A.   It was written afterwards, yes.

Q.   And this has been Shutterstock's general -- strike that.

Is it true that there is no written policy, during any time period that you worked at Shutterstock, relating to when a complainant writes back wanting more information; such as royalties earned, how many licenses issued, and names of the clients who licensed the content?

A.   We don't have a written policy.

Q.   Or any policy, right?

A.   We do.  Well, we do have a policy.  We respond and we -- they -- we let them know that we can -- if it has been licensed, we can share the --

the earnings with them if they sign an NDA.  If they do agree to that, they sign it, we let them know; and then if they -- sometimes the -- the earnings are so small they're -- they're like don't worry about it.  Or if they want the earnings, then we sign a -- an -- a settlement agreement, and we pay them.  We do absolutely have a policy.

Q.    How many times have you offered to provide a complainant this information?

A.    It rarely comes up.  I think this year it's been five complainants.  It rarely comes up.

Q.    And did Shutterstock pay these complainants?

A.    They did.

Q.    Do you know if those have been produced in this case?

A.    I do not know.  Well, I think one's in the process; but yes, there's -- there's five that I can recall, just five.

Q.    And you mentioned something about earnings related to the -- the licenses sold.  What does that mean?

A.    Contributor earnings.

Q.    Contributor earnings.

What does that mean; how do -- how does --

small.  I mean, nothing -- I don't -- I think that $200.00 was the most that I remember.

Q.    And this is prior to when this policy was -- was written?

A.    I'm just talking about this year.

Q.    You mean 2025?

A.    Yes.

Q.    Okay.  What about 2024?

A.    I don't -- I have no idea.

Q.    Do you recall any instance in 2024 -- strike that.

Does Shutterstock know of any instances in 2024 in which they offered to pay a complainant money?

A.    I think I maybe had one or two.  Like I say, it really doesn't come up.  This -- it was -- it's unusual that it's been five already this year.

Q.    Okay.  And since you've been in the legal department, is it something that happened every year?

A.    Someone requests their earnings every year?

Q.    Yes.

A.    Yes.  Just not very often.

Q.    And Shutterstock's policy is to offer them

that the customer has to continue using the image.

Q.    So Shutterstock does have that right, correct?

A.    Yes.

Q.    Always had that right based on the Licensing Agreements generally?

A.    I don't know about always.  I imagine.

Q.    Okay.

A.    But yes, at the time of this, yes.

Q.    But it's true that there's a difference between submitting content versus the approval of that content, right?

A.    Yes.

Q.    All right.  If we go down a little bit -- and this is just a general question.  I'm sure that Shutterstock receives millions of content submissions every week from hundreds of thousands of contributors?

A.    It is true.

Q.    And it's true that Shutterstock cannot make assumptions about whether any of that content submitted, can't make any assumptions about the ownership, correct?

A.    Like I -- like I said before, we generally have no reason to doubt that they are not the

(800) 528-3335    NAEGELI DEPOSITION & TRIAL    NAEGELIUSA.COM
Established 1980

Q.   500?

A.   No idea.

Q.   The only way to determine that would be to -- to search within Salesforce for DMCA notices?

A.   We'd have to run a report on every DMCA -- every image that was removed per a DMCA and see if they were ever licensed.

Q.   Okay.  And that can be done, which is the same process that was done to collect the information that was produced in this case, right?

A.   Yes.

Q.   Okay.  More work for your small team?

A.   Thanks.

Q.   I don't know if that was a compliment, but sarcasm can't be picked up on the record.

MR. BARTOLOMEI:  And Jim or Hilary, do you mind just emailing this to -- to us on a break if you get a chance?

MR. ROSENFELD:  Sure.

MR. BARTOLOMEI:  Just so we have it.  And are we marking this confidential too?

MR. ROSENFELD:  No.

MR. BARTOLOMEI:  Okay.

MR. ROSENFELD:  I mean, you can -- it's just a reference for her, but I figured you would

MR. BARTOLOMEI:  Hold on.  There we go.
I'm not going to move it.

BY MR. BARTOLOMEI:

Q.    Upon notice -- it reads, "Upon notice from Shutterstock or if you learn that any content is subject to a threatened or actual claim of infringement, violation of another right, or any other claim for which Shutterstock may be liable, or if Shutterstock removes any Content due to perceived business risk as determined in Shutterstock's reasonable discretion and gives you notice of such removal, you will remove the Content from your computer systems and storage devices (electronic or physical) and, if possible, cease any future use of the removed content at your own expense."

And then goes on to say, "Shutterstock shall provide you with comparable Content (which comparability will be determined by Shutterstock in its reasonable commercial judgment) free of charge," and is subject to the terms and conditions of the TOS.

Did I read that correctly?

A.    Yes.

Q.    I want to direct your attention to the language that Shutterstock has chosen in this

remove it.  It's not a demand letter.  We ask them to remove it, and they comply.  I've never had a customer come back and refuse to remove it from their systems ever.

Q.   In the language that I have highlighted there in blue, it says, "... you will remove the Content ...," correct?

A.   Yes, I understand.  But I'm not -- I'm saying when we send out a kill notice --

MR. ROSENFELD:  Object.  Argumentative.

BY MR. BARTOLOMEI:

Q.   Whatever it says, it says there, correct?

A.   It says, you will remove.

Q.   And in 5.6, it goes on to read, "If you use any Content as part of work product created for delivery to a client or customer, you will disclose the identities of such clients or customers to Shutterstock, upon Shutterstock's reasonable request."

Did I read that correctly?

A.   Yes.

Q.   So isn't it true that Shutterstock has the right to know who their customer is creating work product for, and the identity of Shutterstock's customers, clients and customers?

Q.   Why is that?

A.   Again, it's -- it's about a poor customer experience.  Many times it's not licensed already; it hasn't been licensed, so there's no reason to send a kill notice because no one's licensed it. You know, it's -- it's a -- the perceived risk, and that Shutterstock makes a determination whether or not a kill order should be sent.

Q.   But I'm only talking about when a license has been purchased by a customer, it's true that Shutterstock doesn't have a policy to send a kill notice to that customer, true?

A.   That's correct.  We -- the policy is not to send a kill notice for every single takedown that we receive.

Q.   Even despite the fact that Shutterstock has knowledge of specific infringement of that content, correct?

A.   Yes; for the reasons that I've already mentioned.

Q.   Because it's poor customer service?

MR. ROSENFELD:  Objection.  Misstates her testimony.

THE DEPONENT:  It does misstate my testimony.

Q.    Okay.

A.    -- from the website.  It is no longer available for licensing.

Q.    Well, it says, "... we elected to treat it as a proper notice and expeditiously removed the images(s) in question."  That's what it says, right?

A.    Yes.

Q.    And it doesn't say anything about removing it from the website, right?

A.    The second paragraph.

Q.    You're right.

Does it say anything about removing it from the Shutterstock customers?

A.    No.

Q.    Okay.

MR. BARTOLOMEI:  Okay.  We're going to move to 11.

(WHEREUPON, Exhibit 11 was marked for identification.)

BY MR. BARTOLOMEI:

Q.    Actually, I had one more question regarding 8, if you can pull that one back up.

A.    8?

Q.    Yeah.  Before I ask you about 11.  When Ms. Herrick wrote the email on January 25th, isn't

HEATHER SHIMMIN                April 24, 2025                          196
84630                                                              30(b)(1)

it true that she's asking Shutterstock to "...
compensate any profits made by providing the image
as a royalty-free download"?

A.   She --

Q.   Do you see that?

A.   She did.

Q.   Okay.  And was this information ever taken
into consideration about trying to resolve this
claim with Ms. Herrick?

A.   So one, there were multiple email threads,
so whoever processed the case, which was me, may not
have seen the initial email because this one went to
help, right.  So she had multiple -- every time
someone emails, a new case is generated.

Q.   Okay.

A.   So just because she wrote in -- if she
wrote into, let's say, help@shutterstock.com, I may
not be aware that she has done that already.

Q.   Okay.

A.   Because we don't look for the entire
history of a -- of a case.  We're looking at the
case in front of us; we don't know if they've
written in before.

Q.   So the help desk isn't -- strike that.

The case that's assigned to the

help@shutterstock.com is not trained to respond to a request to compensate any profits made from infringing content, is it?

A.   I'm --

MR. ROSENFELD:  Objection to form.  Go ahead.

THE DEPONENT:  I'm sorry.

I'm just saying that whoever processes a case may not, and usually won't, have -- wouldn't know that multiple emails would have been sent.

BY MR. BARTOLOMEI:

Q.   Okay.  Was -- whether multiple emails, you know, have been sent, it's true that Shutterstock didn't offer to pay Ms. Herrick --

A.   Right.  But I'm saying in -- in response to the DMCA, the response that I told her, she never replied.  Had she -- had she said, well, what about earnings, then I would have happily gone to, if you sign an NDA, we're happy to share that with you.

Q.   Okay.

A.   She never replied other than I want a phone call, and we don't offer phone -- phone support for legal issues.  So when I said your image has been removed, had she replied with well, what about the earnings that I brought up before, like I

there was a copyright claim?

A.   Not at that time.

Q.   And it's true that Ms. Herrick had already asked about earnings; she just didn't ask the right department about earnings on this particular photo?

A.   Well, as a -- as an email thread that she found someone that addressed her concern, she did not bring it up with that person.  So she didn't tell me.  I didn't -- you know, you can't answer what you don't know.  She didn't tell me that she wanted it; otherwise, I would have been happy to provide it.

Q.   And you mentioned that no kill notice had been sent to any of the customers of Shutterstock, even though Shutterstock knew about infringement regarding this specific content?

A.   Not at that time.

Q.   When did they send them?

A.   I do not know the date it was sent.  I wasn't the one who sent it.

Q.   Was it after the lawsuit was filed?

A.   Again, I was not the person who sent it. I don't know the date.

Q.   Does Shutterstock only send kill notices when a lawsuit is filed?

(800) 528-3335   NAEGELI DEPOSITION & TRIAL   NAEGELIUSA.COM
Established 1980

Q.   Okay.  And is that consistent with what happened when Ms. Shimmin, aka ███, had enough information to suspend this particular image?

A.   Yes.

Q.   And it shows at the top, Earnings: $4.96, correct?

A.   Commission.

Q.   I think it's less than $5.00?

A.   It is.  It's 4 and change.

Q.   Okay.

A.   Sorry.  I can't quite see it.

Q.   Licenses: 12, right?

A.   Yes.

Q.   So is this -- this is the number of licenses that this particular piece of content was licensed to Shutterstock's customers, right?

A.   Yes.

Q.   And that $4.96, if that's what it really says, is the amount that the contributor was compensated?

A.   Yes.  Well, contributor earnings.

Q.   Okay.  Contributor earnings.  And is that -- once that money goes out the door, meaning once the contributor is paid, does Shutterstock ever try to require the contributor to repay them if their

(800) 528-3335   NAEGELI DEPOSITION & TRIAL   Established 1980   NAEGELIUSA.COM

CERTIFICATE

I, Mae Knight, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 8th day of May, 2025.

Mae Knight #4284