UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CYNTHIA HERRICK, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:23-cv-03191-JPC-SLC |
| *Plaintiff*, | **PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL** |
| v. | |
| SHUTTERSTOCK, INC., | |
| *Defendant*. | |

**CERA LLP**
Solomon B. Cera (admitted *pro hac vice*)
Thomas C Bright (admitted *pro hac vice*)
50 California Street, Suite 1500
San Francisco, California 94111
Telephone: 415-777-2230
scera@cerallp.com
tbright@cerallp.com

**CERA LLP**
C. Andrew Dirksen (admitted *pro hac vice*)
529 Main St., Suite P200
Boston, MA 02129
Telephone: 857-453-6555
cdirksen@cerallp.com

**DUNCAN FIRM, P.A.**
James H. Bartolomei, III
Of Counsel at Duncan Firm, P.A.
809 W. 3rd Street
Little Rock, Arkansas 72201
Telephone: 501-228-7600
james@duncanfirm.com

**HOBEN LAW**
Bryan D. Hoben, Esq.
1112 Main Street
Peekskill, New York 10566
Telephone: 347-855-4008
bryan@hobenlaw.com

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ............................................................................................. ii–iv

**INTRODUCTION** .............................................................................................................. 1

**ARGUMENT** ..................................................................................................................... 4

    **I.  THE PROPOSED CLASS IS DEFINED BY OBJECTIVE CRITERIA AND IS ASCERTAINABLE.** ....................................................................................................... 4

    **II.  COMMON QUESTIONS OF LAW AND FACT PREDOMINATE.** ..................... 6

        A.  DMCA Notice Compliance Is Not an Element Plaintiff Must Prove. ............... 6

        B.  The Void-License Question Has a Common Answer for All Class Members ... 7

        C.  Ownership Is Susceptible to Common Proof. ...................................................... 8

        D.  Shutterstock's Kill-Notice Conduct Is Provable by Common Evidence. .......... 9

        E.  DMCA Safe Harbor Is a Common Defense, Not an Individualized One. ....... 10

        F.  Damages Are Susceptible to Classwide Measurement. .................................... 12

    **III. PLAINTIFF SATISFIES THE REQUIREMENTS OF RULE 23(a).** ................. 13

    **IV.  A CLASS ACTION IS THE SUPERIOR METHOD FOR RESOLVING THIS DISPUTE.** ................................................................................................................. 16

    **V.  PLAINTIFF IS IDEALLY SUITED TO REPRESENT A RULE 23(b)(2) INJUNCTIVE CLASS; IN THE ALTERNATIVE, RULE 23(c)(4) ISSUE CERTIFICATION IS APPROPRIATE.** ....................................................................... 18

**CONCLUSION** ............................................................................................................... 20

**TABLE OF AUTHORITIES**

<u>Cases</u>

*American Pipe & Constr. Co. v. Utah,* 414 U.S. 538 (1974) ..........................................................17

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455 (2013)................................................5

*Baffa v. Donaldson,* 222 F.3d 52 (2d Cir. 2000).............................................................................15

*Bartz v. Anthropic PBC,* 791 F. Supp. 3d 1038 (N.D. Cal. 2025) ......................................3, 5, 6, 8

*Berni v. Barilla S.p.A.,* 964 F.3d 141 (2d Cir. 2020) .....................................................................18

*Bryant v. Media Right Prods., Inc.,* 603 F.3d 135 (2d Cir. 2010) ..................................................12

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.,* 196 F. Supp. 3d 395 (S.D.N.Y. 2016).............5

*Comcast Corp. v. Behrend,* 569 U.S. 27 (2013) ..............................................................................11

*Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473 (2d Cir. 1995) ........................................13

*Cox Commc'ns, Inc. v. Sony,* 146 S. Ct. 959 (2026)........................................................................7

*Davis v. The Gap, Inc.,* 246 F.3d 152 (2d Cir. 2001) ...............................................................12, 15

*Effects Assocs., Inc. v. Cohen,* 908 F.2d 555 (9th Cir. 1990) ..........................................................7

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340 (1991) ....................................................6

*Football Ass'n Premier League Ltd. v. YouTube, Inc.,* 297 F.R.D. 64 (S.D.N.Y. 2013) ..............11

*Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC,* 139 S. Ct. 881 (2019) .....................4

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159 (2d Cir. 1971) .....7, 9, 10

*Herrick v. Shutterstock, Inc.,* No. 23 CIV. 3191, 2024 WL 1348754 (S.D.N.Y. Mar. 29, 2024) ...6

*In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ..............................................................................................................................15

*In re Frontier Commc'ns Corp.,* 658 B.R. 277 (Bankr. S.D.N.Y. 2024) ........................................10

*In re Petrobras Sec.,* 862 F.3d 250 (2d Cir. 2017) ..........................................................................6

*Johnson v. Nextel Commc'ns Inc.,* 780 F.3d 128 (2d Cir. 2015) ....................................................13

*Kihn v. Bill Graham Archives LLC,* No. 20-17397, 2022 WL 18935 (9th Cir. Jan. 3, 2022) .........9

*Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130 (S.D.N.Y. 2017) ...................................20

*McGucken v. Shutterstock, Inc.,* 166 F.4th 361 (2d Cir. 2026) ..........................................2, 10, 11

*McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215 (2d Cir. 2008) ......................................................17

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005) ..................................7

*Michael Grecco Prods., Inc. v. RADesign, Inc.,* 112 F.4th 144 (2d Cir. 2024)............................18

*Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154 (2010) ....................................................................5

*Roach v. T.L. Cannon Corp.,* 778 F.3d 401 (2d Cir. 2015) ......................................................12, 14

*Robidoux v. Celani,* 987 F.2d 931 (2d Cir. 1993)............................................................................14

*Rodriguez v. Westech Sec. & Investigation Inc.,* 2026 WL 743454 (S.D.N.Y. Mar. 16, 2026)....16

*Schneider v. YouTube, LLC,* 674 F. Supp. 3d 704 (N.D. Cal. 2023) ..........................................1, 10

*Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304 (2d Cir. 1963) ...................................9

*Spinelli v. National Football League,* 903 F.3d 185 (2d Cir. 2018)..............................................15

*Sykes v. Mel Harris & Assocs., LLC,* 285 F.R.D. 279 (S.D.N.Y. 2012) .......................................20

*Sykes v. Mel S. Harris & Assocs. LLC,* 780 F.3d 70 (2d Cir. 2015)..............................................12

*Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442 (2016) ................................................................13

*Vincent v. Money Store,* 304 F.R.D. 446 (S.D.N.Y. 2015).............................................................16

*Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) ...........................................................7, 9, 13

*Waite v. UMG Recordings, Inc.,* No. 19-CV-01091, 2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023) ....................................................................................................................................................9

*Warner Chappell Music, Inc. v. Nealy,* 601 U.S. 366 (2024)........................................................17

### Statutes & Rules

Fed. R. Civ. P. 23...................................................................................................................... passim

Fed. R. Civ. P. 23(a)..................................................................................................................13, 15

Fed. R. Civ. P. 23(a)(2).....................................................................................................................13

Fed. R. Civ. P. 23(a)(4).....................................................................................................................15

Fed. R. Civ. P. 23(b)(2)..................................................................................................1, 18, 20, 21

Fed. R. Civ. P. 23(b)(3)..............................................................................................1, 8, 16, 20, 21

Fed. R. Civ. P. 23(c)(1)(C) ...............................................................................................................17

Fed. R. Civ. P. 23(c)(4)................................................................................................................18, 21

Fed. R. Civ. P. 23(g)(1).....................................................................................................................21

Fed. R. Civ. P. 53(a)(1)(B)(ii)...........................................................................................................13

17 U.S.C. § 410(c) ........................................................................................................................5, 8

17 U.S.C. § 411(a) ..............................................................................................................................5

17 U.S.C. § 412...................................................................................................................................12

17 U.S.C. § 504(b) .......................................................................................................................12, 15

17 U.S.C. § 504(c)(1)..................................................................................................................8, 12, 13

17 U.S.C. § 512(c) ..................................................................................................................6, 10, 11, 21

17 U.S.C. § 512(c)(1)(C) ...................................................................................................................11

17 U.S.C. § 512(c)(3)..........................................................................................................................6

17 U.S.C. § 512(c)(3)(B)(i).................................................................................................................6

17 U.S.C. § 512(l) ................................................................................................................................6

## **Other Authorities**

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.01 (Matthew Bender rev. ed.) ...........................................................................................................................................7

Plaintiff Cynthia Herrick ("Plaintiff" or "Herrick") respectfully submits this Reply Memorandum of Law in support of her Motion for Class Certification under Rules 23(a) and 23(b)(3), and for injunctive or corresponding declaratory relief under Rule 23(b)(2).[1]

## INTRODUCTION

Shutterstock's opposition rests on a single premise: that liability turns on the contents of each request or notice it received to take down a work, not Shutterstock's own post-removal conduct, resulting in 4,647 individualized mini-trials. That premise misstates Plaintiff's claim and ignores the record.

This case is not about Shutterstock's decision to remove works from its platform. It is about Shutterstock's uniform, classwide post-removal conduct: its knowledge that the purported licenses it had sold for those removed works conveyed nothing, its retention of the licensing fees it received, and its consistent decision—made by a two-person team and documented in its own records—not to notify downstream customer licensees ("Licensee Customers") that the licenses they had purchased from Shutterstock conveyed no rights. Approximately 98% of the 18,921 works removed during the discovery period (April 17, 2020, through April 17, 2023) never generated a kill notice. This action seeks to recover the actual and/or statutory damages owed to the copyright holders whose works Shutterstock monetized and continued to monetize after learning it had no authority to license the works from the time those works were uploaded to Shutterstock's platform.

Three threshold clarifications are warranted. First, Plaintiff does not contend that Shutterstock's acceptance of a takedown notice established infringement or voided any license as a matter of law. *Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 720 (N.D. Cal. 2023), holds that a platform's response to a takedown is not a judicial determination of infringement. The licenses

---

[1] References to "Rule #" are to the Federal Rules of Civil Procedure unless otherwise indicated.

1

were *void ab initio* by *nemo dat*: a license issued through a contributor who held no rights conveyed nothing from inception, regardless of any request or notice to take it down. The takedown marks when Shutterstock learned of infringement. Second, Plaintiff does not contend that *McGucken* established that Shutterstock is categorically ineligible for DMCA safe harbor protection. Third, the word "valid" is retired from the common questions; whether any takedown request or notice satisfied § 512(c)(3) is an element of Shutterstock's defense, not Plaintiff's copyright infringement claim, and it was never meant to suggest that the legal validity of any takedown sent to Shutterstock was in strict compliance with the DMCA, only that Shutterstock in practical effect treated the takedown as valid by removing works from its platform that it had licensed to Licensee Customers.

The table below demonstrates that proof of every element of liability and damages originates primarily from Shutterstock's own business records, its admissions in discovery responses, and the testimony of the few employees who managed its takedown and kill-notice practices. As the following chart demonstrates, class treatment is warranted here:

| Questions Common to the Class | Common Proof |
|---|---|
| Identity of each putative class member who submitted each takedown request or notice (name, email, contact) and number of unique works. | Burns Decl. ¶ 6 (ECF No. 112) ("from" email address in every takedown request or notice); Shutterstock's R&O to Rogs 6, 8, 17, 20 (Shutterstock's takedown log); Raff Decl., ¶ 4 (ECF No. 113) (Shutterstock was able to calculate that during the discovery period, it received 4,647 requests to take down works from its site, and also that 18,921 "works taken down in response to these requests . . . had been licensed to Shutterstock's customers," necessarily meaning Shutterstock has contact information about these requestors (putative class members, rights holders); Bartolomei Decl. (accompanying this reply), Ex. B, Excerpts from Ex. 38 of the Raff. Decl. (ECF No. 113-1), Shutterstock's 10K for the period ending December 31, 2023, showing among other things that Shutterstock informed the SEC they have IP rights and license tracking plus customer database management, corroborating Shutterstock's Rogs 17 and 20 (Shutterstock can identify Licensee Customers of works pertinent to this case). |

| Date Shutterstock received notice (accrual/willfulness) | Shutterstock's records identifying the dates it received takedown notices, *see above* |
|---|---|
| Which work(s) were removed and when | Shutterstock's removal records (R&O to Rogs 8, 20); ECF No. 109-2, Bright Decl., Ex. B., Shimmin Dep. 219:15–23 (Inventory Manager "Asset Activity" log records date of removal per DMCA notice); Raff Decl., ¶ 4 (ECF No. 113) (Shutterstock has information about 18,921 "works taken down in response to [takedown] requests [received during the discovery period] . . . [that] had been licensed to Shutterstock's customers" (Licensee Customers) |
| Whether, when, to whom, and for how much each work was licensed | Shutterstock's Looker system (Raff Dep. 57:3–58:6; 173:23-174:7; Shimmin Dep. 224:4–14); R&O to Rogs 15, 17, 20 (kill notice scope, contact info/identity of licensees, licensing history per image); Raff Decl., ¶ 4 (ECF No. 113) (Shutterstock has information about 18,921 "works taken down in response to [takedown] requests [received during the discovery period] . . . [that] had been licensed to Shutterstock's customers" (Licensee Customers) |
| Whether a kill notice was sent (98% of licensees received none) | Shutterstock's records (R&O to Rogs 15, 21); Shimmin Dep. 89:18-89:24, 90:10-90:16, 90:17-90:24; 93:1–7; 95:17, 132:22-133:3 (ability and practice of issuing kill notices) |
| Whether the class member was ever compensated by Shutterstock | Shutterstock's records (R&O to Rogs 7, 22; Shimmin Dep. 93:8–14 (only 5 payouts in class period, "rarely comes up"); 95:25–96:3 (contingent on signing NDA and settlement agreement); 96:9 ("sometimes" re: whether Shutterstock's revenue share is included); 112:22–113:4 ("if they want to be paid, then we pay them") |
| Copyright registration and § 412 timeliness | Shutterstock's records contain registered information if it was included in a takedown request or notice; U.S. Copyright Office public records; also, in the event of a court-authorized distribution, claimants may submit proof of copyright registration of a pertinent work to receive any money (*e.g,* through a claims process similar to that in *Bartz v. Anthropic*) |

Proof that any class member would use to litigate its own individual copyright infringement claim (common proof), as Plaintiff has done here, is in the possession and control of Shutterstock, with the exception of one external record concerning a work—Copyright Office registration—that is a public, searchable federal government record. Checking a certificate number against a public register is database administration, not a mini-trial. A mini-trial involves contested credibility and disputed proof; checking a certificate number against a public register involves neither.

3

As the chart above demonstrates, questions of law or fact are not only common to class members but also predominate over any questions affecting only individual members. Liability is uniformly premised on Shutterstock's common business practices and treatment of rights holders like Plaintiff Herrick after it receives and takes down a work pursuant to a takedown notice the rights holder sent Shutterstock, including Shutterstock's retention of the direct monetary benefits it received and its uniform decision not to send kill notices concerning the work to its Licensee Customers. Absent class certification, there will truly be a wrong without a remedy.

## ARGUMENT

### I.    THE PROPOSED CLASS IS DEFINED BY OBJECTIVE CRITERIA AND IS ASCERTAINABLE.

The class definition employs three objective, record-based criteria for membership: (1) the class member owns a work registered with the United States Copyright Office; (2) the class member submitted a takedown notice to Shutterstock during the Class Period; and (3) the class member is identified in Shutterstock's records as having owned the rights to a work for which at least one license was sold to a Licensee Customer by Shutterstock prior to its receipt of the takedown notice. Each criterion is easily determinable without any individualized merits inquiry, and all but one are proven and verifiable directly from Shutterstock's business own records.

**Ownership and Registration.** Shutterstock claims it maintains no records of whether takedown-notice rights holders have registered a work with the U.S. Copyright Office, except for registration information that may be present in some takedown requests it received and still maintains. If the proposed class is certified, notice will issue that a class member must own a work registered with the Copyright Office (as required for filing an infringement claim individually) identified in the takedown it sent to Shutterstock. *Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881 (2019). A registration carries a presumption of validity and

ownership under 17 U.S.C. § 410(c). *BWP Media USA, Inc. v. Gossip Cop Media, Inc.,* 196 F. Supp. 3d 395, 402 (S.D.N.Y. 2016) (registration certificate is prima facie evidence of copyright ownership). The burden of rebutting that presumption falls on Shutterstock. Speculative affirmative defenses do not defeat predominance. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013). And § 411(a)'s registration requirement is a non-jurisdictional claim-processing rule — in no way a bar to class certification — meaning administrative compliance can be managed through the claims process rather than as a threshold to suit. *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 157 (2010). In other words, here, in order to receive a share of a distribution from a common fund, a rights holder class member like Plaintiff must submit proof of registration of its work sent in a takedown to Shutterstock in order to become an authorized claimant to the fund; i.e., a claims process similar to that in an antitrust direct purchaser price-fixing case where class members submit proof of their class-period purchases of a product from a defendant in their claim form before becoming eligible to receive a share of a common fund for the benefit of the class. Those who cannot submit proof cannot participate in a recovery.

Proof of registration could easily be accomplished and submitted through a *Bartz* claims protocol: a sworn claim identifying the registration, served on any person with a possible competing ownership interest, with court resolution of genuine disputes before payment. *Bartz v. Anthropic PBC,* 791 F. Supp. 3d 1038, 1055–56 (N.D. Cal. 2025). That protocol proved workable at a scale twenty-five times larger than this case: 482,460 works, a 92%+ claim rate, and no administrative disorder. For example, within 30 days of certification, Shutterstock could send the Court a list of all potential class members (a "Class List") containing the Shutterstock image ID, takedown date, requestor contact information including email address, license count, and gross revenue from licenses to Licensee Customers—before Court-authorized notice issues.

Shutterstock's evidence of ownership disputes is one example in 1,800 sampled images. Burns Decl. Exs. 8–9. The rare genuine dispute about ownership is a claims-administration matter, not a certification barrier. In fact, the Court has already made the law of the case when it held that difficulty identifying class members goes to administrative feasibility—which the Second Circuit expressly rejects as a certification barrier. *Herrick v. Shutterstock, Inc.,* No. 23 CIV. 3191, 2024 WL 1348754, at *8 (S.D.N.Y. Mar. 29, 2024) (citing *In re Petrobras Sec.,* 862 F.3d 250, 269 (2d Cir. 2017)). Ascertainability requires only that the class "be defined using objective criteria that establish a membership with definite boundaries." *Petrobras,* 862 F.3d at 264. The proposed class meets that threshold using Shutterstock's own records.

## II.    COMMON QUESTIONS OF LAW AND FACT PREDOMINATE

### A.    DMCA Notice Compliance Is Not an Element Plaintiff Must Prove.

Shutterstock's predominance argument depends entirely on the false premise that it is an element of her copyright infringement claim that Plaintiff's takedown notice, and by extension each class member's notice, must have complied fully with 17 U.S.C. § 512(c)(3), creating a mini-trial on the legal validity of Plaintiff's notice and by extension thousands of class members' notices in notice-by-notice mini-trials. It is not. Direct copyright infringement requires (1) ownership of a registered copyright in a work and (2) unauthorized copying of protected expression. There is no knowledge element, no notice element, and no DMCA-compliance element, and in this case, only identical public display, copying and licensing of works by Shutterstock is at issue. Direct liability is also strict liability. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

The DMCA does not impose obligations on Shutterstock; it offers Shutterstock a conditional defense. Section 512(l) confirms the safe harbor is "in addition to" any other defense— it does not define the scope of copyright liability, especially for Shutterstock's conduct off of its

platform. A noncompliant notice may help Shutterstock preserve its safe harbor under § 512(c)(3)(B)(i) regarding removing works from its platform, but this affects Shutterstock's defense to an infringement claim; it is not an element of proving the claim that creates individualized liability questions.

Vicarious infringement likewise contains no notice element. Its requirements are: (1) direct infringement by a third party; (2) defendant's right and ability to supervise the infringing activity; and (3) defendant's direct financial benefit from that activity. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005); *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971). Shutterstock's reliance on *Cox Commc'ns, Inc. v. Sony,* 146 S. Ct. 959 (2026), is inapplicable to Plaintiff's theories of liability, as well as this case, because it addresses only contributory infringement, a theory Plaintiff does not make here in part because Plaintiff's vicarious and direct liability theories establish classwide liability.

### B.       The Void-License Question Has a Common Answer for All Class Members.

The licenses Shutterstock issued through contributors who lacked rights were void from inception by operation of *nemo dat quod non habet*: one cannot convey rights one does not have. *See* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.01 (Matthew Bender rev. ed.); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 556 (9th Cir. 1990) (purported license from a party lacking authority conveys no rights). The licensee's use is direct infringement because the license was void from the start, not because Shutterstock "accepted" and processed a takedown, but by *nemo dat*. Whether Shutterstock-issued licenses to its Licensee Customers of works it took down are *void ab initio* when the uploading contributor lacked authority is a single common question whose truth or falsity drives resolution of every class member's claim in one stroke. *Wal-*

7

*Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). That common question, using common proof to answer it classwide, is what Rule 23(b)(3) is designed to resolve and bind class members.

>   **C.    Ownership Is Susceptible to Common Proof.**

Shutterstock's ownership argument—that the absence of a continuously updated ownership database creates individualized mini-trials regarding ownership—overreaches: it would bar every copyright class. The Copyright Act's one-recovery-per-work rule, 17 U.S.C. § 504(c)(1), channels competing ownership claims to a single award per work without requiring individual ownership trials. The § 410(c) presumption shifts the burden of rebutting ownership to Shutterstock for those works that were registered within five (5) years of first publication, which each registration certificate shows on the face of government records: U.S. Copyright Registration documents. And the *Bartz* protocol—sworn claims, court resolution of genuine disputes before payment—resolved ownership across 482,460 works without disorder. *Bartz v. Anthropic PBC*, 791 F. Supp. 3d 1038, 1055–56 (N.D. Cal. 20025). Shutterstock's evidence of actual disputes is also just one example in 1,800 sampled images—a claims-administration footnote, not a certification barrier. In the agreed discovery sample of subpoenas issued to 14 absent-class-members (which Shutterstock proposed), seven (7) of the 14 respondents confirmed copyright registrations; non-response is not non-registration and, in any event, those that did not register their work cannot become certified class members as will be clear in any Court-authorized notice.

The "similar-but-not-identical" takedown notice concern is resolved definitionally, in that "the work" referred to in the proposed class definition is "the work" for all purposes, it is an identical copy of "the work" referred to in the takedown, that Shutterstock removed from its platform, and that Shutterstock licensed to one or more of its Licensee Customers, i.e., the

8

definition excludes similarity-based notices and eliminating substantial-similarity, *de minimis,* and fair-use individuation in a single stroke.

Shutterstock's reliance on *Kihn v. Bill Graham Archives LLC,* No. 20-17397, 2022 WL 18935 (9th Cir. Jan. 3, 2022), and *Waite v. UMG Recordings, Inc.,* No. 19-CV-01091, 2023 WL 1069690 (S.D.N.Y. Jan. 27, 2023), are also misplaced. *Kihn* involved individually negotiated consent agreements requiring one-by-one review; *Waite* turned on individualized work-made-for-hire disputes. Neither issue arises here: every class member identified themselves as the rights holder by submitting a takedown notice, Shutterstock's Looker system records every license, and no work-for-hire question has been raised as to any class member's work.

### D.      Shutterstock's Kill-Notice Conduct Is Provable by Common Evidence.

The three vicarious liability elements are each proven by uniform evidence common to each class member's work. **Right and ability to supervise**: § 5.5 of Shutterstock's standard license agreement—in every license, for every class member's work—obligates each customer to "remove the Content . . . and cease any future use" upon notice from Shutterstock. This is the classic licensor-licensee relationship the Second Circuit established in *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963), and confirmed in *Gershwin*: a licensor who reserves supervisory rights and receives a financial benefit is vicariously liable for its licensee's infringement. **Operational ability**: Shutterstock holds contact records for every licensee (R&O to Rogs 17, 20) and a proven kill-notice mechanism it deployed 359 times during the discovery period. **Direct financial benefit**: Shutterstock's retained share of every void license, recorded in Looker. All three elements are proven by one defendant's uniform records, common to every class member's claim.

9

Shutterstock's "discretionary" characterization does not defeat predominance. *Dukes* distinguished genuine dispersed managerial discretion—exercised by thousands of local managers across the country with no common direction—from a uniform corporate practice. 564 U.S. at 355–56. Here, one two-person team applied the same identified factors (R&O to Rogs 16) to every notice and reached the same result: no kill notice in 98% of claims. That is a common practice, not 18,921 individual judgment calls. Labeling it "discretionary" also concedes capability: one cannot exercise discretion over a decision one has no right or ability to make, which is itself an admission of the right-and-ability element. "[I]f a defendant has the right to block access, such right must be 'exercised to its fullest extent' to 'escape imposition of vicarious liability.'" *In re Frontier Commc'ns Corp.,* 658 B.R. 277, 293 (Bankr. S.D.N.Y. 2024).

The *Schneider*/*VHT*/*Perfect 10* line of cases — that a contractual termination right is not "practical and technical ability" — addresses defendants policing strangers on open user-generated content (UGC) platforms with no contractual relationship to the alleged infringers. That is not this case. Shutterstock is in direct contractual privity with every licensee Customer through the agreement containing § 5.5 for each work purportedly licensed. This is the *Shapiro/Gershwin* licensor-licensee relationship, not a platform-policing case.

**E.      DMCA Safe Harbor Is a Common Defense, Not an Individualized One.**

After *McGucken*, whether Shutterstock qualifies for § 512(c) protection for activities on the Shutterstock platform turns entirely on platform-wide, Shutterstock-side facts: whether its manual, discretionary content curation takes storage outside "at the direction of a user," and whether its review process pipeline gives it "substantial influence." *McGucken v. Shutterstock, Inc.,* 166 F.4th 361, 373–74 (2d Cir. 2026). These questions have one answer for all 18,921 works. Shutterstock does not curate some works differently than others. Its review pipeline, content

standards, and submission guidelines are uniform for each work. Whichever way the safe harbor comes out, the answer is the same for every member of this class, i.e., the answer predominates among the class over any individualized issues.

More fundamentally, § 512(c) limits liability only for infringement "by reason of the storage at the direction of a user of material that *resides* on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c) (emphasis added). A licensee's exploitation of a downloaded work in a textbook or commercial product or a website is not material residing on Shutterstock's system. Even a perfected safe harbor cannot reach Shutterstock's vicarious liability for off-platform customer-licensee conduct that Shutterstock's license agreement states it has supervisory control over and the right and ability to stop that customer from use of that work. Shutterstock's "we removed the works from our platform" defense is axiomatic *solving a problem that does not exist*. This is a defense to a claim Plaintiff does not bring. *McGucken* footnote 9 decided only that removal from the platform satisfied § 512(c)(1)(C)'s expeditious-removal element; it says nothing about Shutterstock's off-platform liability. *McGucken*, 166 at 374 n.9.

*Football Ass'n Premier League Ltd. v. YouTube, Inc.,* 297 F.R.D. 64 (S.D.N.Y. 2013), is also distinguishable. YouTube had no contractual relationship with users who uploaded infringing content and there was no per-work revenue ledger to point to in the record (*i.e.* a measurable direct financial benefit). Here, Shutterstock is the principal active licensor, holds a direct contract with every downstream licensee under § 5.5, and maintains a complete per-work revenue record in Looker. The individualized notice and ownership disputes that defeated certification in *Football Association Premier League* are absent here because Shutterstock's own records supply the common evidence that YouTube's records could not, and YouTube also did not license works.

11

### F.    Damages Are Susceptible to Classwide Measurement.

*Comcast* requires a damages model consistent with the liability theory and is satisfied here. *Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013). Variation in amounts of damages do not defeat predominance. *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 407–08 (2d Cir. 2015); *Sykes v. Mel S. Harris & Assocs. LLC,* 780 F.3d 70, 82 (2d Cir. 2015). Plaintiff's liability is that Shutterstock sold licenses it had no authority to sell. Every such transaction—public display, reproduction and distribution of a class member's work, recorded in Shutterstock's Looker system—is a direct infringing act. Sub-classing for damages resolves the § 412 timing question:

**Subclass A** (effective registration precedes the date of Shutterstock's first license of the work, or registered within three months of first publication): **statutory damages** under § 504(c)(1) —one award per work covering all infringements for which defendants are jointly and severally liable, set by the jury on common evidence of willfulness and applied across the works list. Each *Bryant* factor—Shutterstock's state of mind, its profits, its conduct, deterrence—is common: one defendant, a consistent, common business decision, and one revenue record. *Bryant v. Media Right Prods., Inc.,* 603 F.3d 135, 144 (2d Cir. 2010).

**Subclass B** (all other class members): **actual damages** based on profits under § 504(b), measured by the fair market value of each license — what a willing buyer actually paid for that license, license by license, work by work, recorded in Looker —  and disgorgement of Shutterstock's retained profits. No expert testimony is required. *Davis v. The Gap, Inc.,* 246 F.3d 152, 166 (2d Cir. 2001).

**Package licensing.** Shutterstock allocates package revenue to individual images per download in the ordinary course of business — because that is how it pays contributors. Shimmin Dep. 150:11–

12

18, 152:6-15.  Plaintiff adopts Shutterstock's own allocation methodology. If per-image allocation were analytically impossible, Shutterstock could not operate its contributor-payment program.

**Downstream use and Subclass A.** For Subclass A, § 504(c)(1)'s one-award-per-work rule covers all infringements for which Shutterstock is jointly and severally liable—no census of downstream uses is required. For Subclass B, Zambrowski conceded that absent a kill notice a licensee "will most likely keep exploiting the work." Zambrowski Dep. 103:11–20. Shutterstock cannot convert its own failure to maintain records or its business decision to not stop continuing exploitation of a work into a certification bar. *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 455–57 (2016). Individual settlements entered by class members with downstream licensees, as Plaintiff did, are claims-stage offsets, not liability questions. Whether a licensed work was actually publicly displayed or distributed by a customer is irrelevant to the direct infringement that occurred when Shutterstock first distributed and its customer licensed the work on its platform. The Court may also appoint a special master under Rule 53(a)(1)(B)(ii) to perform the damages accounting from Shutterstock's Looker records should a separate damages proceeding prove appropriate.

## II.    PLAINTIFF SATISFIES THE REQUIREMENTS OF RULE 23(a)

**Numerosity** is undisputed: 18,921 works across 4,647 takedown requests, making joinder impracticable for the class members. *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995).

**Commonality.** A single significant question common to the class satisfies Rule 23(a)(2). *Dukes,* 564 U.S. at 359. Whether Shutterstock infringed the copyrights of Plaintiff and class members when it licensed their works without authorization and then failed to send kill notices (and stop its customers from continuing exploitation) while retaining the direct licensing revenue — a question answerable from Shutterstock's records—is a single common question. *Johnson v.*

*Nextel Commc'ns Inc.,* 780 F.3d 128, 137–38 (2d Cir. 2015) (commonality satisfied where defendant's conduct "gives rise to the same kind of claims from all class members").

**Typicality.** "[T]ypicality is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir. 1993). The typicality requirement is "not highly demanding" because claims need only share the same essential characteristics. This Court so found. ECF No. 33 at 21. Herrick's claim is typical because it arises from the same course of conduct challenged on behalf of the class: upon notice, Shutterstock removed her work, retained the licensing revenue from licenses it had sold, and —like it did for approximately 98% of removed works—declined to notify downstream licensees that their licenses conveyed no rights. Only after this lawsuit had been pending for months did Shutterstock reverse course and send kill notices to the twelve licensees of Herrick's works, demonstrating both that the requested relief was operationally feasible and that its prior inaction reflected a business choice rather than any practical inability to act. Differences in the amount of damages among class members do not defeat typicality. *Roach*, 778 F.3d at 409.

Shutterstock argues Herrick is atypical because Shutterstock eventually sent kill notices for her Plover Photo. Those notices, however, were sent 28 months after Shutterstock removed the works and only after litigation was already underway, when Raff was gathering discovery in this case. Raff Dep. 153:19–154:14. Far from defeating typicality, that chronology confirms it. For over two years, Herrick was treated exactly like the rest of the class. The belated kill notices demonstrate only that Shutterstock always possessed the ability to notify its customers' licensees and chose not to exercise it until litigation intervened.

Shutterstock next argues that Herrick's history with *National Geographic* and gallery exhibitions render her damages atypical. They do not. Herrick seeks disgorgement of Shutterstock's ill-gotten gains and a hypothetical fair market license under an actual damages theory (*i.e.* what Shutterstock charges for a license). *See* 17 U.S.C. § 504(b); *Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001) (disgorgement examines the facts only from the infringer's point of view). In any event, differences in the quantum of damages do not defeat typicality where liability arises from the same course of conduct. *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1175, 2014 WL 7882100, at *32 E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, No. 06-MD-1775 JG VVP, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). Herrick's settlement with a single downstream customer-licensee is irrelevant to certification or liability; Shutterstock is liable for damages its infringement caused her. A representative plaintiff's claims need not be identical to those of absent class members; they need only arise from the same essential course of conduct. They plainly do here.

**Adequacy.** To satisfy Rule 23(a)(4), a class representative must "fairly and adequately protect the interests of the class" and not be subject to "unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson,* 222 F.3d 52, 59 (2d Cir. 2000). Herrick and proposed Class Counsel have vigorously prosecuted this case through discovery, extensive motion practice, and this briefing. No conflict between Herrick's interests and the class has been identified. Herrick intends to prove at trial, using Shutterstock's records and data as any rights holder would in an individual lawsuit, that Shutterstock infringed her copyright-registered work by distributing it via a purported license without authorization and retaining licensing fees while failing to issue kill notices. *Spinelli v. National Football League,* 903 F.3d 185, 197 (2d Cir. 2018). Because the

focus of trial will be on proving the infringement claim from Shutterstock's records—evidence common to every class member—unique defenses will not threaten to dominate the litigation.

### III.   A CLASS ACTION IS THE SUPERIOR METHOD FOR RESOLVING THIS DISPUTE.

Rule 23(b)(3)'s superiority requirement is satisfied. *Vincent v. Money Store,* 304 F.R.D. 446, 462 (S.D.N.Y. 2015) (superiority satisfied where "there are a significant number of putative class members," "no other individual actions" exist, and "statutory and actual damages for each class member would likely be insufficient to incentivize bringing individual actions"). The $405 filing fee for a federal copyright action may exceed the individual recovery for many class members who can only seek actual damages (disgorgement of licensing fees retained by Shutterstock) or this filing fee is barely double the $750 for minimum for statutory damages, making class treatment not merely superior but the only realistic vehicle for relief. Shutterstock concedes it is unaware of any other actions filed by putative class members. Raff Decl. ¶ 8. Every putative class member who asked Shutterstock whether they would be compensated, was told they would not, and "chose not to sue" likely did so because the expense of an individual federal lawsuit exceeded their potential individual recovery — a Hobson's choice is no choice at all.

In this Circuit, superiority is satisfied in the class action context where, as here, class members cannot feasibly bring individual claims. *Rodriguez v. Westech Sec. & Investigation Inc.,* 2026 WL 743454, at *6 (S.D.N.Y. Mar. 16, 2026) ("[c]lass adjudication is superior to individual adjudication . . . [where] 'statutory and actual damages for each class member would likely be insufficient to incentivize bringing individual actions'").

**Due process.** Shutterstock argues class treatment would violate its due process rights by preventing it from challenging individual takedown notices. This is incorrect. The works-list protocol preserves every defense: Shutterstock may challenge lack of registration through a

supervised claims process. The only notices relevant to the certified class for damages purposes are those Shutterstock treated as valid *by accepting the notice and taking the work down* where it had also licensed the work to its customer. The protocol organizes defenses; it eliminates none. *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 232 (2d Cir. 2008) (addressing elimination of individual defenses, not their organization within a supervised process). And as this Court may also *alter or amend* its certification order before final judgment, Rule 23(c)(1)(C), any manageability concerns may be addressed without denial.

**Identification of class members.** Shutterstock suggests class members cannot be easily identified, but its own records tell a different story. Burns Decl. ¶ 6 (ECF No. 112) confirms that Shutterstock's takedown log contains a working email address for every person or entity who submitted a takedown request during the class period. Raff Decl. ¶ 4 confirms 4,647 such requests exist, covering 18,921 removed works which have likely grown since discovery responses were served nearly 18 months ago. The class notice list is an email mail merge from Shutterstock's own database — a better, more effective notice universe than nearly any certified consumer class, where publication in national publications and trade journals to unknown purchasers (i/e. in antitrust class) is routinely accepted.

**Statute of limitations.** Every class member's discovery date is documented in Shutterstock's own takedown log. The discovery places every membership-triggering notice within three years of filing. *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538 (1974) (tolling for absent members from date of filing). *Warner Chappell Music, Inc. v. Nealy,* 601 U.S. 366 (2024) (no damages cap for timely discovery-rule claim). The limitations inquiry is a date comparison based on Shutterstock's own records, not a mini-trial. *Michael Grecco Prods., Inc. v. RADesign, Inc.,* 112 F.4th 144, 150 (2d Cir. 2024)

**IV.    PLAINTIFF IS IDEALLY SUITED TO REPRESENT A RULE 23(b)(2) INJUNCTIVE CLASS; IN THE ALTERNATIVE, RULE 23(c)(4) ISSUE CERTIFICATION IS APPROPRIATE.**

**Rule 23(b)(2).** Shutterstock argues Herrick lacks standing for injunctive relief because it ultimately sent kill notices for her Plover Photo. Opp. at 35. Those kill notices arrived 28 months after her takedown, mid-litigation, at Raff's direction, while he was gathering discovery in this very case — textbook voluntary cessation. Raff 153:15–154:14 (admitting that he personally directed kill notices during litigation while gathering discovery.) That's not past conduct — that's the response apparatus actively operating mid-suit. Shutterstock wasn't winding down the challenged system, it was running it while litigating. Voluntary cessation does not extinguish prospective standing unless the defendant can show the challenged conduct cannot reasonably be expected to recur. *Berni v. Barilla S.p.A.,* 964 F.3d 141, 148 (2d Cir. 2020). Shutterstock cannot make that showing. Its own witnesses confirmed that kill-notice decisions remain entirely discretionary with "no specific policy" governing when or whether they issue (Bartolomei Decl., Ex. A, Raff Dep. 182:3–21). The *absence* of a policy isn't a past failure, it is a current structural deficiency that continues unless enjoined. Indeed, Shutterstock acknowledged that even where a copyright holder specifically identifies an infringing work on the platform, the decision whether to notify downstream licensees remains a matter of internal discretion rather than a mandatory practice. Shimmin Dep. 132:17–24, 133:9-19. Asked why Shutterstock generally declines to issue kill notices, Shimmin explained that doing so creates "a poor customer experience" for Shutterstock's licensee customers. *Id*. In other words, the decision turns on a platform-wide business objective, not on the facts or legal sufficiency of any individual takedown notice.

More fundamentally, the threat is not hypothetical because the challenged conduct never ceased. As Shutterstock admits in deposition that it continues to engage in the conduct to be

enjoined. "Sometimes we send a kill notice...sometimes we don't" / "Generally, we don't send out a kill notice." Shimmin 89:18–23; 90:17–24. These describe current practice, not historical. On any given day, class members submit takedown notices, Shutterstock generally always removes the work, and Shutterstock — as it has for 98% of affected works — decides to not send kill notices to its licensee customers.

Those belated kill notices are not the defense Shutterstock frames them as — they are evidence against it on two fronts. First, they prove the mechanism works: Shutterstock sent 359 kill notices during the class period [R&O to Rogs 20–21], and when, mid-litigation, Raff directed their use with regard to Herrick's works, it functioned. Raff Dep. 153:19–154:14. This demonstrates that, while § 5.5 supplied Shutterstock with the legal authority to direct licensees to cease infringing uses, Shutterstock's established operational procedures and comprehensive licensee contact records furnished the practical ability to exercise that authority. The kill notices therefore establish that Shutterstock possessed both the legal authority and the practical ability to exercise control over downstream infringement when it elected to act. Nothing prevented Shutterstock from invoking that same mechanism for all class members—except its own decision not to. Second, the 28-month gap was a choice: from the moment Shutterstock Herrick's takedown notice, it held the licensee identities, contact records, and the § 5.5 right (ECF No. 109-2, Bright Decl., Ex. B., Shimmin Dep. 303:15-304:4; R&O to Rogs 17, 20); nothing prevented earlier action except the decision not to act. Knowledge, capability, and deliberate inaction (to avoid impacting customer experience) is uniform evidence of willfulness. What Shutterstock presents as remediation is proof of what the entire class was owed from the beginning.

Plaintiff seeks certification of a Rule 23(b)(3) damages class and a parallel Rule 23(b)(2) injunctive class— not a (b)(2) class alone. "[C]ertification of a 23(b)(2) class alone is inappropriate

19

where . . . 'the monetary relief is not incidental to the injunctive or declaratory relief.'" *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 158–59 (S.D.N.Y. 2017). Here, as in *Madden*, Plaintiff is not seeking certification of a (b)(2) class alone — she seeks certification of a Rule 23(b)(3) litigation and damages class, as well as a Rule 23(b)(2) class for injunctive or declaratory relief. This is proper and moots any due process concern. *Sykes v. Mel Harris & Assocs., LLC,* 285 F.R.D. 279, 293 (S.D.N.Y. 2012) ("certification of separate Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages, respectively" is of "no concern"). The requested injunction that requires Shutterstock to exercise its control under § 5.5 rights and send kill notices to all Licensee Customers of works subject to accepted takedowns will benefit every class member uniformly now and in the future. *Madden,* 237 F. Supp. 3d at 159–60.

Shutterstock also argues "[a]n injunction requiring kill notices in response to every takedown request would not differentiate between putative class members who sent noncompliant [or compliant] takedown requests." Opp. at 34. This mischaracterizes the relief sought. Plaintiff declaratory relief only as to requests that refer to works Shutterstock took down—*i.e.*, works that Shutterstock treated as valid by removing them after receiving notice from April 17, 2020, through the present—<u>where one or more Licensee Customers exist to whom Shutterstock can send a kill notice</u>. That is precisely the set of works that defines the putative class.

If the Court has any doubt about full 23(b)(3) treatment, Plaintiff requests oral argument.

## CONCLUSION

For the foregoing reasons, the Court should certify the proposed damages class under Rules 23(a) and 23(b)(3) and the injunctive relief class under Rule 23(b)(2); appoint Plaintiff Cynthia Herrick as Class Representative for each Class; and appoint Cera LLP, Duncan Firm, P.A., and Hoben Law as Class Counsel under Rule 23(g)(1).

Dated: June 26, 2026

Respectfully submitted,

**CERA LLP**

By: */s/ Thomas C. Bright*
Thomas C. Bright (*pro hac vice*)
tbright@cerallp.com
Solomon B. Cera (*pro hac vice*)
scera@cerallp.com
50 California Street, Suite 1500
San Francisco, CA 94111
Tel: (415) 977-2229

By: */s/ C. Andrew Dirksen*
**CERA LLP**
C. Andrew Dirksen (*pro hac vice*)
529 Main St., Suite P200
Boston, MA 02129
Telephone: 857-453-6555

**DUNCAN FIRM, P.A.**
James H. Bartolomei, III
james@duncanfirm.com
809 W. 3rd Street
Little Rock, Arkansas 72201
Tel: 501-228-7600

**HOBEN LAW**
Bryan D. Hoben, Esq.
bryan@hobenlaw.com
1112 Main Street
Peekskill, New York 10566
Tel: 347-855-4008

21

## CERTIFICATE OF COMPLIANCE WITH CIV. L. R. 7.1(c)

I, C. Andrew Dirksen, certify that this reply memorandum of law was prepared using a computer word-processing program and contains 6,294 words (excluding the caption, table of contents, table of authorities, signature block, this certificate, the below certification, and the proof of service) as permitted by Local Civil Rule 7.1(c). This memorandum therefore complies with the 20 page-limit set forth in the stipulation of the parties (ECF No. 100) and the word-count limitation of 7000 words set forth in Local Civil Rule 7.1(c) (*i.e.*, 3500 plus ten (10) times 350).

*/s/ C. Andrew Dirksen*
C. Andrew Dirksen


## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

I, C. Andrew Dirksen, certify that, with respect to this memorandum of law, a colleague used "Claude," an artificial intelligence tool, to prepare the Table of Authorities and Table of Contents. I also certify that although I personally reviewed this filing for accuracy, it is my understanding based on information and belief that "Claude" uses Microsoft Word's own Table of Contents and Table of Authorities (collectively, "Tables") process to code the memorandum and generate the Tables, and that there is no more reason to think it makes any mistake(s) different from those that might be made by a human being using Microsoft Word to generate the Tables. In reviewing the filing for accuracy, I reviewed every word of this filing, including the legal citations and headings of sections, and compared them with the Tables generated by "Claude" for accuracy, and corrected any errors that I found by re-coding the document (or asking someone at my direction to re-code it) using Microsoft Word's process for coding section headings and legal citations within the document and generating the Tables.

I understand that I remain individually responsible for verifying the accuracy of any output produced by an AI tool, and that failure to comply with the Court's Rules may result in the filing being stricken and/or the imposition of sanctions.

*/s/ C. Andrew Dirksen*
C. Andrew Dirksen


## PROOF OF SERVICE

The undersigned certifies that a copy of this document was served by me or at my direction upon the attorneys of record of all parties to the above cause when it was filed via the Court's ECF system on June 26, 2026, and that I declare under the penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

By: */s/ C. Andrew Dirksen*
C. Andrew Dirksen

22