UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CYNTHIA HERRICK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SHUTTERSTOCK, INC.,<br><br>Defendant. | Case No. 1:23-cv-03191-JPC-SLC<br><br>**DECLARATION OF JAMES H. BARTOLOMEI III IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL** |

I, James H. Bartolomei III, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am an attorney with the law firm of Duncan Firm PA, one of the counsel in this action for Plaintiff Cynthia Herrick. I submit this declaration in support of Plaintiff's Reply Memorandum Of Law In Support Of Motion For Class Certification, Appointment Of Class Representative And Class Counsel. The matters stated herein are true based on my own knowledge and, if called to testify thereto, I could and would competently do so.

2.      I and others at my firm have worked diligently on this litigation for the benefit of the plaintiff and the members of the class sought to be certified. My firm has worked closely with attorneys Thomas Bright, Sol Cera, Andrew Dirksen and Bryan Hoben in representing the Plaintiff and the interests of the class. Among the tasks we have performed are the following: (1) investigated, prepared and filed a complaint that has ultimately withstood a Rule 12 challenge; (2) propounded and responded to discovery; (3) researched, briefed and argued motions to dismiss; (4) reviewed and analyzed Shutterstock documents; (5) deposed corporate

1

representatives under Rule 30(b)(6) and other employees of Shutterstock under Rule 30; and (6) negotiated numerous complex stipulations including a protective order approved by this Court.

3.    I personally made the redactions to the original Exhibit C of Thomas Bright's declaration (Dkt. 109-3) and file a corrected Exhibit A herein.  I met and conferred with counsel for Shutterstock to address their attempts to redact and/seal information that may go to the heart of the issues in dispute.

4.    Attached hereto as Exhibit **A** is a true and corrected and substituted copy of the transcript deposition cites of Andrew Raff that was originally filed as Dkt. 109-3.

5.    Attached hereto as Exhibit **B** is a true and correct copy of excerpts of Andrew Raff's declaration exhibit 38 (Dkt. 113-1), which is the Shutterstock 10K filed with the SEC for the period ending December 31, 2023, when this action had been pending since April 2023. These highlighted pages from Raff's declaration exhibit show:

   A. **"Perpetual license except for IP rights removal" admission (p. 9) --**  "once a contributor's content is licensed through our platform, such content is perpetually subject to the customer's license even if the contributor removes the image from our marketplace, **except in periodic circumstances where content is removed due to concerns about third-party intellectual property rights.**"

   B. **Technology/tracking admission (p. 8) --** "We use a combination of internally-developed software and third-party applications that enable customer and contributor support, **intellectual property rights and license tracking**, centralized invoicing and sales order processing, **customer database management**..."

C. **Warranty and indemnification exposure (pp. 9-10, 25).** The 10-K admits: "we have incurred, and will expect to continue to incur, expenses related to such claims and related settlements."

D. **Known-risk admission (p. 25) --** "Although we have implemented measures to review the content that we accept into our collection, we cannot guarantee that each contributor holds the rights or releases he or she claims... As a result, we and our customers have been, and **in the future will likely be**, subject to third-party claims, including intellectual property infringement claims, related to our customers' use of our content."

E. **"Protected from legal risk" as a competitive differentiator (p. 12) -** "content licensing options and **the degree to which users are protected from legal risk**"

F. **Legal Proceedings non-disclosure (p. 39) —** "Although we are not currently a party to any material active litigation..."

This 10-K was filed in February 2024, covering FY2023. This action was filed in April 2023—nine months before this filing. Shutterstock represented to the SEC they had no "material active litigation." **(p. 39)**

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June 2026 at Little Rock, Arkansas.

*/s/ James H. Bartolomei III*
James H. Bartolomei III

# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Docket No. 1:23-CV-03191-JPC-SLC

----------------------------------------x

CYNTHIA HERRICK, Individually and

On Behalf of All Others Similarly

Situated,

                        Plaintiff,

      - against -

SHUTTERSTOCK, INC.,

                        Defendant.

----------------------------------------x

              DATE:  July 14, 2025

              TIME:  11:06 a.m.

            ** CONFIDENTIAL **

      DEPOSITION of ANDREW RAFF, taken by

counsel for Defendants, pursuant to Notice,

held remotely via Zoom videoconference,

before Roberta Caiola, a Shorthand Reporter

and Notary Public of the State of New York.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

A P P E A R A N C E S:


THE DUNCAN LAW FIRM

Attorneys for Plaintiff

        809 West Third Street

        Little Rock, Arkansas 72201

        501.228.7600

BY:   JAMES H. BARTOLOMEI, III, ESQ.

        james@duncanfirm.com

        - and -

HOBEN LAW

        1112 Main Street

        Peekskill, New York 10566

        347.855.4008

BY:   BRYAN HOBEN, ESQ.

        bryan@hobenlaw.com

        - and -

CERA LLP

        50 California Street, Suite 1500

        San Francisco, California 94111

        415.777.2230

BY:   THOMAS C. BRIGHT, ESQ.

        tbright@cerallp.com

 

Confidential

A  P  P  E  A  R  A  N  C  E  S:


DAVIS WRIGHT TREMAINE LLP

Attorneys for Defendant

     1251 Avenue of the Americas

     21st Floor

     New York, New York 10020

     212.489.8230

BY:   JAMES ROSENFELD, ESQ.

     jamesrosenfeld@dwt.com


ALSO PRESENT:

     Keith Montgomery, Exhibit Technician

888-893-3767                    Lexitas operates in all 50 states and is licensed where required.
www.lexitaslegal.com            Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Confidential                                                                                              Page 4

S T I P U L A T I O N S

    IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

        IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

        IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court and that a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

(The witness presented government-issued identification and identity is verified.)

THE REPORTER:  The parties and counsel participating in this deposition acknowledge that I am not physically present and will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will be sworn in remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Mr. Raff, would you please raise your right hand.

(Witness complies.)

THE REPORTER:  Do you swear that the testimony that you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



ANDREW RAFF, the witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

MR. BRIGHT:

Q.    Good morning, Mr. Raff.  Again, my name is Thomas Bright, I represent Cynthia Herrick, the plaintiff in this matter.

Could you please spell your name for the record?

A.    Sure.  My name is Andrew Raff, A-N-D-R-E-W, R-A-F-F.

Q.    The court reporter has put you under oath.  Do you understand that this requires you to give -- to testify truthfully, to the best of your knowledge?

A.    Yes, I understand.

Q.    Okay.  And what is your current title at Shutterstock, Mr. Raff?

A.    Assistant General Counsel, Privacy and Security.

Q.    Okay.  Have you ever been --

MR. ROSENFELD:  We lost your audio too, not just your video.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Confidential

handling of various disputes, issues, research on legal requirements.

Q.    Okay.  Thank you.

Was there a name for the small legal team, attorney team?

A.    The legal team?

Q.    Yes.

A.    There was a general counsel, two associate counsel, and I don't know if there was a formal -- formal name for the department in New York at the time.

Q.    Okay.  What type of contract negotiations were you involved in while you served as associate counsel?

A.    So Shutterstock operates a two-sided marketplace.  We license content from contributors and also entered sales agreements for customers to license content that's uploaded by those contributors.  So it involved contracts on both sides of that arrangement, most with the customers, the contributors, as well as vendors, contractors and other suppliers to -- to the company.

Q.    Okay.  Now, my understanding

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179
LEXITAS

Confidential

A.    No.

Q.    So you kind of took her place; is that correct?

A.    I took over some of her responsibilities.

Q.    Okay.

A.    We didn't replace the position exactly, but we -- I took on some of the responsibilities that she had.

Q.    As assistant general counsel, who did you report to?

A.    So until 2020, when she left the company, I reported to Ms. Garfield. In 2021, when our current general counsel joined the company, John Lapham, that's J-O-H-N, L-A-P-H-A-M, I reported to him.

And in -- I don't remember if it was at the end of 2021 or in 2022, when -- at some point after Colleen Kearney joined the company as deputy general counsel, that's C-O-L-L-E-E-N, K-E-A-R-N-E-Y, I reported to Ms. Kearney, or I currently report to Ms. Kearney.

Q.    You talked about one of your job responsibilities was kind of helping

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Confidential                                                     Page 30

the company implement the DDDR, correct?

A.      Correct.

Q.      Who reported to you as assistant general counsel?

A.      When I was promoted to assistant general counsel in 2019, I had no direct reports.  I took on direct reports when I started managing the team of IP agents, that's Heather Shimmin and Artur Zambrowski, in 2021.

Q.      The team of IP agents, is there a name for that team?

A.      We typically call it the IP team.

Q.      Okay.  So the IP team, when was that formed, in 2021?

A.      So the IP team dates back to 2012.  When Ms. Patel joined the company she was a -- started as the sole I think it was called content compliance at the time, she was the sole member of that team.

Q.      Okay.  I'm sorry if I forgot this.  She left in 2021 and then you took over some of her duties, one of which was being the head of the IP team; is that

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

gathering these figures?

A.    Yes, I did.

Q.    Okay.  If you look at the second sentence, it says:  "The total revenues Shutterstock accrued from images that were taken down as part of the potential class (and excluding ones that have been reinstated) is ███████████

███████████████████████

Do you see that?

A.    I do.

Q.    Is that correct?

A.    This appears to be an accurate communication of the calculation that we made.  The calculation was based on the identification of works as part of the potential class that were identified as having been taken down for a DMCA claim, without regard to an evaluation of whether the underlying claim was in fact a copyright claim, whether there was a question of substantial similarity, copyrightability of the work or other issues.

So summing all of the revenues

**over the class period, which I think was going back three years from the date of the suit, that appears to be the correct -- when we added up all of the license sales and royalties from those images, this was the number that resulted.**

Q.   This is for April 2020 through -- what was the end date, Mr. Raff?

**A.   This was through when we conducted the sample in late 2024.**

Q.   Have you had an opportunity to update this number through the present?

**A.   I have not.**

Q.   So my understanding is this revenue number encompasses all works where the rights holder submitted the takedown notice and Shutterstock had already sold -- or had sold a license for that work?

**A.   This represents all cases where someone has submitted a takedown notice and Shutterstock had previously sold the license to that work.**

Q.   Understood.  Okay.

Now it says accrued royalties ▮▮▮▮▮▮.   Can you tell me what accrued

Confidential

royalty means there?

A.    Every time a license is issued on the platform, the system automatically calculates the royalty payable to the contributor at that point, depending on where the contributor is in their lifecycle, that may be between 15 percent and 40 percent.

Contributors are paid out monthly and every -- as long as they have at least $25, or if they set a higher balance in their accounts, they will get paid out that every month, each month that their balance exceeds that $25 or other floor.

And then -- and so where we have terminated a contributor account, they will receive no further payouts from the date of termination.  So there may be some amount of the royalties that have been paid out to contributors and some amount that have not been.

Q.    Let's take the case that you mentioned, where a contributor has been terminated and his balance at the time --

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

there at least five people on there?

A.    I -- within -- within the last year, the only time I've looked at this was not with the weekly report, but in terms of seeing what the full amount of data that we have in this was going back for the I think it was 12-month period that we have.

Q.    Do you remember the number of people that were on the report for that 12-month period?

A.    I do not.

Q.    Can you give me a range?

A.    I do not remember what that was.

Q.    Was it less than ten?

A.    I do not remember.

Q.    I'm talking about the one for the 12-month period.  There could have been less than ten?

A.    I don't remember.

Q.    Now, if a rights holder sends Shutterstock a DMCA takedown notice and the work that are referenced in the notice Shutterstock has sold the license for, does Shutterstock tell the rights holder the



Confidential

amount of royalties earned for a particular work that is subject to their claim?

A.    No.  Generally, no.

Q.    And what are the exceptions?

A.    We will -- each of these situations is different, and we have some rights holders who write in who seem unconcerned about this and are just happy to have the images taken down.  Others who write in are more interested to find out about that information.

Within the last I think it was about a year or so ago, we developed a standard process -- maybe it was earlier than that, but with a form NDA, so that we could share the royalty information without having to review the details more thoroughly to understand if there was any reason we couldn't provide that information.  Any confidential information would be included in the royalty amounts.

Q.    And the same question with respect to the number of licenses issued for a particular work that's subject to the claim?

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Confidential

there.  If you can make it bigger.

Q.    Are you able to see that case number there?

A.    **I can see that now.**

Q.    That's the parent case number. That's the case number you're talking about that follows this takedown notice, correct?

A.    **I believe with this specific one, I created a case for sending the kill notices for these two images as its own case.**

Q.    Okay.  Now you said this was a template, correct?

A.    **Correct.**

Q.    Why are you generating this in the first instance?  Why isn't this generated by someone on the IP team in the first instance?

A.    **I was doing this because we were -- I was in the process of gathering information for discovery in this case and recognized that we had not sent any kill notices to the customers who downloaded these two images.**

Q.    Would it be fair to say that if



Confidential                                                    Page 154

we hadn't propounded any discovery in the case, the user here would not have received a kill notice?

MR. ROSENFELD:  Objection to form.  You can answer if you can.

A.    I can't speculate.

Q.    The reason you sent this out, that you're the one doing this, is because you were involved in discovery responses in our litigation, and you realized at that point that no kill notice had been sent, and so you sent this one out; is that correct?

A.    That is correct.  I also believe, looking at the message date and time, that this was late on a Friday afternoon in the summer.  Whereas, normally I might ask the team to do it, to send something.  I didn't want to bother them at that point and did it myself.

Q.    Fair enough.

Do you know who a Mariah Trisch is?

A.    I believe she is an attorney at Informa Group, the parent company of Taylor

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

message you reply to -- her name is Sarah.
Do you know Sarah's last name, Mr. Raff?

     **A.     I can't read it currently, but
it looks like** ▮▮▮▮▮▮

     Q.     ▮▮▮▮▮▮▮▮▮ , correct?

     **A.     Yes.**

     Q.     And here you write:  "Hi ▮▮▮
thanks for looking into this and your fast
response.  Can you please let me know:
          How many copies of the book
have been printed.  If there are any plans
for additional print runs and subsequent
editions, is it possible to remove or
replace this image from those future
editions?"

          Then we eventually get up to --
          MR. BRIGHT:  Mr. Montgomery,
     let's go to Shutterstock 287.  There
     is a message there, Mr. Montgomery,
     it says "Hi Andrew, sorry for the
     delay in getting back to you about
     this," I think this is about halfway
     up, "here is what I found."
          See if you can find that
     message, Mr. Montgomery, and when you

LEXITAS

do, if you can please zoom in on that.

MR. MONTGOMERY:  Can you repeat that, I'm trying to look and I got lost here.

MR. BRIGHT:  No problem.  I'm looking at SHUTTERSTOCK_000287 and I'm counting from the bottom, the fourth message from the bottom please.

MR. MONTGOMERY:  Is that correct?

MR. BRIGHT:  That's it.

BY MR. BRIGHT:

Q.    Mr. Raff, do you see in the second paragraph he writes:  "There are currently 8430 copies in print.  It sounds like we will reprint in about 6 to 8 months.  I can select a new photo to replace Shutterstock image ID number for when the book reprints.  Does that work for you?"

Do you see that?

A.    I do.

Q.    And then above that, just at

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Confidential

is a tool that we use.

Q.    Can you spell that?

A.    L-O-O-K-E-R.

Q.    What is that?

A.    Looker is a system that we use to gather reports out of Shutterstock's systems.

Q.    Earlier we were looking at a kill notice that you sent out to the licensees of Ms. Herrick's work.  What's the purpose of a kill notice?

A.    The purpose of a kill notice is, as it says on its face, to inform the customers to cease use of an image.

Q.    Isn't it true that a kill notice is meant to stop or limit continuing infringement of that specific work?

MR. ROSENFELD:  Objection to form.  Leading.

A.    If infringement is the basis for ceasing of use, then that can be the situation.

Q.    Now, in Shutterstock, after a work is taken down pursuant to a takedown notice, is a kill notice sent to all

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



licensees?

A.      Not automatically.

Q.      Okay.  What is the percentage of work taken down, pursuant to a takedown notice, for which a kill notice is sent?

A.      I don't know.

Q.      Do you have a range or an estimate?

A.      I do not have an -- I do not have an estimate nor am I even sure how I could formulate an estimate because we don't -- the processes for those live in unconnected systems.  Sometimes the kill notices are sent within the same Salesforce case as the takedown notice, sometimes, as the ones we were just looking at, they are sent in a separate Salesforce case, and so we don't have a single way to map those together.

Q.      Okay.  Through your vast knowledge inside the IP team, do you have a general idea if the percentage of kill notices sent out want to take down those who received for copyright infringement?

A.      I -- I don't.

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



whether to send a kill notice or not in a particular case.

Q.      Does Shutterstock have a policy to notify their customers related to an infringement claim about the specific content their customer licensed?

A.      We do not have a written policy about that.

Q.      Okay.  So when are kill notices sent out?

A.      We look at each case.  It's each -- each case is very fact-specific, and it's hard to say that there is a whole lot of commonality among them; so we look at it in each instance.

I can't think of any situation where I've been asked sending kill notices where I have said that we should not send kill notices, but that's -- you know, there's no -- there's no specific policy towards that.

Q.      You just testified, I believe, that you don't recall ever telling someone on the IP team to not send a kill notice, correct?

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

A.    I can't remember.  I don't remember any time.  I certainly wouldn't say it's impossible to have done that in the last three years.

Q.    Sure.  Now, understanding that, have there been times where you told them to send a kill notice out?

A.    Yes.

Q.    And how many times?

A.    I don't know, off the top of my head.

Q.    Can you give me an estimate or a range?

A.    I really don't know.  I talk with the team, as I mentioned, multiple times a week.  They each handle -- the team handles about 1,000 cases a month, and I don't remember all the details of what we -- you know, about the specific ones too clearly.

Q.    Does Shutterstock conduct a business risk assessment to determine whether to send a kill notice or not?

A.    We don't have --

MR. ROSENFELD:  Objection to

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

Confidential                                            Page 184

form.

A.    We don't have a formal template or tool for judging business risk as a parameter.  I look at this as something where we want to think about whether it's a -- to understand what the situation is and look at each individual set of facts and the situation about each individual case, you know, in its own -- in its own world.

Q.    That's done on a case-by-case basis, is that what you're saying?

A.    That's what I'm saying, yes.

Q.    Is the identity of the licensee, or how the licensee used the work, a factor in determining whether or not Shutterstock will send a kill notice?

A.    Yes.

Q.    Tell me how that factor is weighted, please?

A.    So we have some customers who have stronger conditions in their license agreements about their ability to remove content from finished products.  So we would take that into -- into consideration,

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required.
Nevada Registration #116F  -  California Firm Registration #179



Confidential                                                                          Page 192

happened?

A.    That happens not infrequently. I've dealt with a couple of issues like that recently, so there may be some recency bias to it, but it happens a few times per year.

Q.    Less than five per year?

A.    Probably more than that.

Q.    What's your best estimate?

A.    Anything is going to be a wild guess.  My guess -- I don't really know. Enough that it seems familiar, but not -- it's not the bulk of issues that we received.

Q.    You went from a couple to not the bulk.  They can both be true at the same time.

A.    Well, I think I've explained the volume of cases that my team touches on on an annual basis.  That's the universe, but I -- I just don't have -- I don't have enough data to really quantify that.

Q.    Do you believe that once a work is removed, subject to a takedown notice, that Shutterstock has no responsibility to



remove or otherwise stop licensing customers from using the work?

MR. ROSENFELD:  Objection to form.  You can answer.

A.    I think that Shutterstock stands behind the licenses that we issue to our customers with indemnity.  So it's to Shutterstock's benefit to do that, to inform customers of that directly rather than them receiving demand letters from rights holders directly and/or dealing with litigation or areas where it's much more costly for Shutterstock to have to indemnify; so yeah, that's where I'm trailing off.

Q.    In your answer you say "so it's to Shutterstock's benefit to do that."  I'm sorry, strike that.  Let me start over again.

In your answer you say "I think that Shutterstock stands behind the licenses that we issue to our customers with indemnity, so it's to Shutterstock's benefit to do that, to inform customers of that directly rather than them receiving

 

demand letters from rights holders."

So when you say "it's to Shutterstock's benefit to do that," you mean to send the kill notice?

A.    Correct.

Q.    Okay.  If that's true, then why don't they do it every time?

A.    I don't know.

Q.    Okay.  How many claims did Shutterstock settle from April 2020 to the present, in which a copyright holder or its agents, in the DMCA takedown notice, had subsequently demanded payment?

A.    I don't know, off the top of my head.

Q.    Can you break that down per year?

A.    No.

Q.    Do you know how many settlement agreements Shutterstock entered into with rights holders in 2025, or so far in 2025?

A.    I don't have that in front of me, so I'm not entirely sure.

Q.    Does five sound in the ballpark?

888-893-3767
www.lexitaslegal.com          Lexitas operates in all 50 states and is licensed where required.
                              Nevada Registration #116F  -  California Firm Registration #179

LEXITAS

CERTIFICATE


STATE OF NEW YORK   )

          : ss

COUNTY OF BRONX     )


     I, ROBERTA CAIOLA, a Certified

Shorthand Reporter, do hereby certify:

     That ANDREW RAFF, the witness whose

deposition is hereinbefore set forth, was

duly sworn by me and that such deposition

is a true record of the testimony given by

the witness.

     I further certify that I am not

related to any of the parties to this

action by blood or marriage, and that I am

in no way interested in the outcome of this

matter.

     IN WITNESS WHEREOF, I have hereunto

set my hand on July 17, 2025.



     _____

          ROBERTA CAIOLA

888-893-3767                Lexitas operates in all 50 states and is licensed where required.          LEXITAS
www.lexitaslegal.com        Nevada Registration #116F  -  California Firm Registration #179

# EXHIBIT B

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

_____

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ___ to ___**

**Commission File Number: 001-35669**

_____

# Shutterstock, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **80-0812659** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**350 Fifth Avenue, 20th Floor**
**New York, NY 10118**
(Address of principal executive offices, including zip code)
646 710-3417
Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, $0.01 par value per share | SSTK | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | | ☐ |
|---|---|---|---|
| | | Accelerated filer | |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☒

As of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of its voting and non-voting common stock held by non-affiliates was $1,203,063,393, based on the last reported sale price of the registrant's common stock on that date.

On February 21, 2024, 35,544,416 shares of the registrant's common stock were outstanding.

_____

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this Annual Report on Form 10-K, to the extent not set forth herein, is incorporated herein by reference from the registrant's definitive proxy statement relating to the Annual Meeting of Stockholders to be held in 2024, which definitive proxy statement shall be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Annual Report on Form 10-K relates. Except as expressly incorporated by reference, the registrant's proxy statement shall

not be deemed to be part of this report.

**Form 10-K**
**For the Fiscal Year Ended December 31, 2023**

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| | **Part I** | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 37 |
| Item 1C. | Cybersecurity | 37 |
| Item 2. | Properties | 39 |
| Item 3. | Legal Proceedings | 39 |
| Item 4. | Mine Safety Disclosures | 39 |
| | **Part II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| Item 6. | Reserved | 42 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 61 |
| Item 8. | Financial Statements and Supplementary Data | 62 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 63 |
| Item 9A. | Controls and Procedures | 63 |
| Item 9B. | Other Information | 63 |
| Item 9C. | Disclosures Regarding Foreign Jurisdictions that Prevent Inspections | 64 |
| | **Part III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 65 |
| Item 11. | Executive Compensation | 65 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 65 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 65 |
| Item 14. | Principal Accounting Fees and Services | 65 |
| | **Part IV** | |
| Item 15. | Exhibits, Financial Statement Schedules | F-1 |
| Item 16. | Form 10-K Summary | |

2

explanation of why the image was not selected for publication. We believe that this feedback is valuable to contributors and enhances the quality of future content submissions as well as our customers' experience.

Content accepted into our collection is added to our web properties where it is available for search, selection, license and download. Content accepted is also made available for delivery to our data offering partners for machine learning purposes. Contributors of content typically earn a royalty each time their work is licensed. Contributors earn royalties based on a tiered earnings rate schedule that is tied to annual licensing volume. The earnings tier of the contributor at the time of licensing, as well as the purchase option under which the content was licensed, are used to calculate the royalty earnings for each licensing event. Contributors may choose to remove their content from our collection, subject to the terms of service that govern our contributor relationships.

We provide valuable tools and insights to our contributors. Our contributors can monitor download activity by content type and geography. We also provide insights into trends we see with seasonal and current customer search behaviors to help our contributors plan future content submissions accordingly.

In addition to content sourced through direct submission to our e-commerce platform, we also obtain all types of content through exclusive distribution agreements with strategic partners or through the direct acquisition of content, content libraries or archives. In certain cases, we enter into arrangements with contributors or strategic partners whereby we guarantee a minimum royalty, in exchange for exclusive rights to distribute content when we believe such exclusivity provides us with a distinct competitive advantage. We also license content from our wholly-owned library. We continuously enhance our collection through the direct acquisition of content and by entering into other strategic agreements and partnerships and we continue to seek opportunities for direct acquisition and strategic partnerships to enhance our collection and provide customers with relevant and high-quality content.

**Technology and Infrastructure**

Our technology is critical to our business and we have developed proprietary technology to power our products and services. We believe that delivering intuitive, fast and effective user experiences, supported by scalable technology platforms, is critical to our success. We employ technology to support both our public-facing web properties and our back-office systems. In developing, improving and enhancing these sites and systems, we focus our internal development efforts on creating and enhancing specialized proprietary software that is unique to our business and we leverage commercially available and open source technologies for our more generalized needs.

Our customer-facing software enables users to search the millions of images, vectors, illustrations, footage, music tracks and 3D models available in our collection or request custom branded content and then select, organize, pay for, license and download the content that suits their individual needs. Our search platform evolves automatically based on our own 1st party behavioral data, with each search and download that a user performs on our platform providing our search engine with additional information to improve search results in subsequent queries.

We consider the data that we have collected and the search technology that it powers to be an important proprietary asset and competitive advantage that allows us to provide exceptional service to our customers and enable our business. We continuously invest in the localization of our creative platform across many countries and regions, allowing customers to search and make purchases in a variety of languages and currencies. We also maintain an API driven infrastructure, enabling integration of our content platform with various other software tools and services, which enables businesses, and their customers, to gain access to our content without leaving their platform.

We also develop and continuously invest in contributor-facing web properties, which operate in 29 languages and enable individuals and creative professionals to become contributors, upload and tag content, receive feedback on their submissions from our review team, see reports on earnings and payouts, and participate in online discussion forums with other contributors, among other activities. We have also developed proprietary tools to enable our contributors to improve their success on our web properties, including our keyword trends tool that allows contributors to see what terms customers are searching for and how those search terms are trending over time, which, in turn, allows contributors to anticipate demand and generate content that customers may want to license. Our contributor-facing web properties are powered by proprietary technology which supports a content review system that allows our review team to efficiently and effectively review content submissions. Our combination of proprietary technology and large-scale datasets allows us to deliver value to our users and enhances their experience on our platform, which drives growth on our marketplace.

We use a combination of internally-developed software and third-party applications that enable customer and contributor support, intellectual property rights and license tracking, centralized invoicing and sales order processing, customer database management, language translation and global contributor payouts, in addition to supporting the compliance, finance and accounting functions. We continually improve upon these internal tools to enable business growth and drive efficiency.

8

Our systems infrastructure is hosted primarily by third-party cloud hosting providers that we believe offer scalable, reliable and secure global infrastructure. We also continue to invest in our infrastructure to improve the resiliency of our sites and systems. By using cloud services providers, we believe we are able to dedicate an increasing proportion of our technology resources to scaling our business, better serving our rapidly growing collection of content and meeting global customer demand. We believe continued use of third-party cloud hosting, along with improvements to our platform, allow us to further diversify our product offerings, reach new customers and contributors around the world and enable our developers to rapidly deploy new products, features and functionality.

We have expanded our use of content delivery network solutions to help enable our customers around the world to have sustained and reliable high-speed access to our platform. As we continue to grow our business, our technological needs continue to expand and therefore, we plan to continually invest in our technology to enhance existing products and services and develop new products and services. We view our investments in technology as integral to our long-term success and we intend to continue to investigate, develop and make capital investments in technology and operational systems that support our current business and new areas of potential business expansion.

### Marketing

An important driver of our growth is customer acquisition, which we achieve primarily through online and offline marketing efforts and directly through our sales force. Marketing includes search engine optimization, paid search, online display advertising, trade shows, email marketing, direct mail, affiliate marketing, public relations, social media and partnerships. Over the past several years, our investments in marketing have represented a significant percentage of revenue. This spend considers, among other things, the blended average customer value across our various purchase options so we can manage customer acquisition costs and aim to achieve targeted returns.

We also use customer relationship management (CRM) marketing to grow the lifetime value of our existing customers. Our marketing activities aim to raise awareness of our brands and attract paying customers to our websites and our direct sales organization by promoting the key value propositions of our offerings: diverse and high-quality content, intuitive and efficient interfaces and economical content options.

As our marketing efforts attract additional paying customers and generate more revenue for us, our contributors are also able to receive increased earnings from us. Increasing contributor earnings helps attract more content submissions, which in turn helps Shutterstock convert and retain even more paying customers. We believe the high degree of satisfaction that customers have with our product drives word-of-mouth recommendations, which helps our marketing efforts attract an even broader and more diverse audience than we reach directly. Therefore, we believe our marketing efforts have a self-reinforcing network effect, which powers the growth and success of our marketplace.

### Customer Support

In addition to outbound sales and marketing activities, our customer service teams assist users worldwide via email, chat and phone in over 20 languages and 150 countries. We have customer service teams in a variety of locations including Singapore, Berlin and New York.

### Product Rights and Intellectual Property

#### *Product Rights and Indemnification*

All of the content that we make available to customers on our websites is offered under perpetual, royalty-free licenses, with the exception of certain custom, editorial, music, and other content with specific licensing requirements. Royalty-free means that once a customer has licensed content from us, that customer may use the associated content in accordance with the license terms in perpetuity without having to pay any ongoing royalties to us. Typically, content from our library is licensed on a non-exclusive basis, meaning that multiple customers can license the same image, footage clip or music track under the applicable Shutterstock license agreement. Custom content is one-of-a-kind branded content and is licensed on an exclusive basis to our customers to fulfill their specific use-cases. We do not typically require that contributors of content to our library provide their content to us on an exclusive basis, with the exception of custom content and certain editorial, music and other content to which we have exclusive distribution rights. However, once a contributor's content is licensed through our platform, such content is perpetually subject to the customer's license even if the contributor removes the image from our marketplace, except in periodic circumstances where content is removed due to concerns about third-party intellectual property rights.

Under our various license agreements, we expressly represent and warrant that unaltered content downloaded and used in compliance with our license agreements and applicable law will not infringe any copyright, trademark or other intellectual property right, violate any third-party's rights of privacy or publicity, violate any U.S. law, be defamatory or libelous, or be pornographic or obscene. Provided that a customer has not breached the license agreement or any other agreement with us, we will defend, indemnify, and hold a customer harmless from direct damages attributable to breaches of the express

9

**Competition**

We seek to be an integral component of the creative process for our customers based on a number of factors including the quality, relevance and breadth of content; ability to source new content; accessibility of content; distribution capabilities; ease and speed of search and fulfillment; content pricing models and practices; content licensing options and the degree to which users are protected from legal risk; brand recognition and reputation; the effective use of current and emerging technology; the global nature of our interfaces and marketing efforts, including the degree of localization; and customer service. We also compete for contributors on the basis of several similar factors including ease and speed of the upload and content review process; the volume of customers who license their submitted content; contributor commission models and practices; the degree to which contributors are protected from legal risk; brand recognition and reputation; the effective use of technology; the global nature of our interfaces; and customer service.

The industry in which we operate is extremely competitive and rapidly evolving, with low barriers to entry. Some of our currently and potentially significant competitors include:

- other online platforms that feature marketplaces for stock content such as Getty Images and its iStockphoto offering, AdobeStock, Freepik and Storyblocks;

- specialized visual content companies that are established in local, content or product-specific market segments, such as Visual China Group;

- providers of commercially licensable music such as Universal Music Publishing Group, Sony/ATV Music Publishing and Warner/Chappell Music;

- websites focused on providing creative workflow tools such as Adobe, Canva, Picsart and Bending Spoons;

- websites focused on image search and discovery such as Google Images;

- providers of free images, photography, music, footage and related tools;

- social networking and social media services, including GIF platforms such as Alphabet's Tenor; and

- commissioned photographers and photography agencies.

In addition, we compete with the alternative of creating one's own content or choosing not to consume licensed content due to price considerations or because the user is not aware of how to access licensed content.

**Human Capital**

The Company and its consolidated subsidiaries have 1,274 full-time employees as of December 31, 2023, as compared to 1,328 as of December 31, 2022. Approximately 63% of our global workforce is located in North America and 32% are located in Europe with the remainder located in the rest of the world. None of our employees in the United States are covered by collective bargaining arrangements. In several foreign jurisdictions, including Italy, Canada, France and Brazil, our employees may be subject to national collective bargaining agreements that set minimum salaries, benefits, working conditions and / or termination requirements. We consider our employee relations to be satisfactory. Competition for qualified personnel in our industry is intense, particularly for software engineers, computer scientists and other technical staff.

Our people are critical to our success. We have implemented certain strategies with respect to our employees, to provide a safe, rewarding and respectful workplace. We adhere to our Code of Business Conduct and Ethics, which sets forth a commitment to our stakeholders, including our employees, to operate with integrity and mutual respect. We also incorporate safety principles into every aspect of our business. We have well-developed health and safety programs, which are reinforced through policies, education and engagement of our employees.

We strive to create an outstanding employee experience by creating a culture aligned with our principles by providing our employees access to the programs and initiatives that promote their career growth and development, recognize and reward their performance and support their overall well-being. Our Total Rewards program focuses on developing and implementing policies and programs that support our business goals, maintain competitiveness, promote shared fiscal responsibility among the Company and our employees, strategically align talent within our organization and reward performance, while also managing the costs of such policies and programs. Through our Total Rewards program, we provide our employees with competitive fixed and/or variable pay, and for eligible employees we currently provide access to medical, dental and life insurance benefits, disability coverage, a 401(k) plan, equity-based compensation and employee assistance programs, among other benefits. We encourage employee engagement through regular employee events, productive communication, our global recognition program and by creating a culture of belonging.

12

customers and strategic partners. Technological interruptions could result in a breach of such agreements and subject us to considerable penalties and could cause our customers to believe our service is unreliable, causing harm to our business, reputation and financial condition.

***We face risks resulting from the content in our collection such as unforeseen costs related to infringement claims, potential liability arising from indemnification claims, changes to intellectual property content regulations and laws and the inability to prevent or monitor misuse.***

Our content is licensed from copyright owners such as photographers, illustrators, videographers and composers who contribute content to our collection and, subject to our licenses with our contributors, we typically offer customers a perpetual, royalty-free license to use the content for their editorial or commercial needs. Although we have implemented measures to review the content that we accept into our collection, we cannot guarantee that each contributor holds the rights or releases he or she claims or that such rights and releases are adequate, which in turn affects the licenses granted to our customer. As a result, we and our customers have been, and in the future will likely be, subject to third-party claims, including intellectual property infringement claims, related to our customers' use of our content.

Under our license agreements with our contributors, our contributors represent and warrant that they have the right to license content to us. Under our license agreements with our customers, we expressly represent and warrant that unaltered content downloaded and used in compliance with our license agreements and applicable law will not infringe any copyright, trademark or other intellectual property right, violate any third-party's rights of privacy or publicity, violate any U.S. law, be defamatory or libelous, or be pornographic or obscene. We offer our customers indemnification at amounts ranging from $10,000 to $250,000, with exceptions for certain products for which our indemnification obligations are uncapped, for direct damages attributable to our breach of the express representations and warranties contained in our license agreements. However, our contractual maximum liability may not be enforceable in all jurisdictions. The aggregate amount of capped indemnification liability, or the amount of uncapped indemnification liability in individual instances, may be significant. Any customers who seek indemnification claims from us may also discontinue use of our products and services or encourage other customers to discontinue using our products and services, which could harm our business and reputation.

We are also subject to many federal, state, and foreign laws and regulations related to rights of publicity, rights of privacy, content regulation and intellectual property and we rely on common-law frameworks in order to provide content to our customers. These laws, regulations and frameworks are constantly evolving and may be interpreted, applied, created, or amended in a manner that could seriously harm our business. These legal frameworks are also subject to uncertain judicial interpretation and regulatory and legislative amendments. If the rules around these laws, regulations and doctrines change, if international jurisdictions refuse to apply similar protections, or if a court were to disagree with our application of those rules to our customers' use of content, we and our customers could become subject to third-party claims and we could become subject to significant indemnification liability.

While we maintain insurance policies to cover potential intellectual property disputes and have not historically incurred any material financial liability as a result of these indemnification obligations individually or in the aggregate, we have incurred, and will expect to continue to incur, expenses related to such claims and related settlements, which may increase over time. If a third-party infringement claim or series of claims is brought against us in excess of our insurance coverage or for uninsured liabilities, our business could suffer. In addition, we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts or scope to protect us against all losses.

Further, unauthorized parties have attempted, and may in the future attempt, to improperly use the content in our collection and such misuse of our content may result in lost revenue and increase our risk of litigation. While we have proactively enforced our intellectual property rights, preventing misuse or infringement of our content is inherently difficult and identifying and policing misuse, whether by contributors or customers, requires exceptional resources and may not always be effective. We rely on intellectual property laws and contractual restrictions to protect our rights and the content in our collection. Certain countries may be very lax in enforcing intellectual property laws or have very onerous and time-consuming requirements to enforce intellectual property rights. Litigation in those countries will likely be costly and ineffective. Consequently, these intellectual property laws afford us only limited protection. We cannot guarantee that we will be able to prevent the unauthorized use of our content or that we will be successful in stopping such use once it is detected.

Regardless of their merit, intellectual property and indemnification claims are time-consuming, expensive to litigate or settle and cause significant diversion of management attention and could severely harm our financial condition and reputation, and adversely affect our business.

25

to confirm that its members can be alerted quickly in the event of an actual crisis and meet as a team to discuss the event and response options.

Each of these committees provides summary reports on their activities, which the CISO communicates as appropriate to the Audit Committee.

At the employee level, we maintain an experienced information technology team who are tasked with implementing our privacy and cybersecurity program and support the CISO in carrying out reporting, security and mitigation functions. We also hold annual employee trainings on privacy and cybersecurity, records and information management, and generally seek to promote awareness of cybersecurity risk through communication and education of our employee population.

**Item 2.    Properties.**

Our corporate headquarters and principal office is located in New York, New York, where we lease approximately 103,000 square feet of office space under a lease agreement, as amended, that expires in 2029. Additionally, we have other office facilities in the United States and abroad related to, among other things, sales and marketing support, technology services and customer service under operating lease agreements that expire on various dates during the period from 2024 through 2029. We do not have any material capital lease obligations, and our property, equipment and software have been purchased with cash.

We believe that our existing facilities are adequate for our current needs and that suitable additional or alternative space will be available on commercially reasonable terms to meet our future needs.

For additional information regarding obligations under operating leases, see Note 15 of the Notes to Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K.

**Item 3.    Legal Proceedings.**

Although we are not currently a party to any material active litigation, from time to time, third parties assert claims against us regarding intellectual property rights, employment matters, privacy issues and other matters arising during the ordinary course of business. Although we cannot be certain of the outcome of any litigation or the disposition of any claims, nor the amount of damages and exposure, if any, that we could incur, we currently believe that the final disposition of all existing matters will not have a material adverse effect on our business, results of operations, financial condition or cash flows. In addition, in the ordinary course of our business, we are also subject to periodic threats of lawsuits, investigations and claims. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Item 4.    Mine Safety Disclosures**

Not applicable.

39